**COMMERCIAL CABLE STAFFS' ASS'N
v. LEHMAN et al.**

No. 129.

Circuit Court of Appeals, Second Circuit.

Nov. 20, 1939.

---

CLARK, Circuit Judge, dissenting.

Beverly R. Myles, of New York City, for appellant.

Eustace Seligman, of New York City, for appellees Robert Lehman and others.

Benjamin A. Javits, of New York City, for appellees Cecil P. Stewart and others.

Before L. HAND, AUGUSTUS N. HAND, and CLARK, Circuit Judges.

LEARNED HAND, Circuit Judge.

This is an appeal from three orders in bankruptcy, approving and confirming a joint plan of reorganization of the Postal Telegraph & Cable Company and the "Associated Companies", "debtors" under § 77B of the Bankruptcy Act, 11 U.S.C.A. § 207. The appellant, Commercial Cable Staffs' Association, which for brevity we shall speak of as the Association, is an association of employees of the Commercial Cable Company, which is not in reorganization, though it.is a subsidiary of the "Associated Companies"; the Association asserts the right to oppose the confirmation

of the plan because the money and other property which the Commercial Cable Company is to transfer in its execution will either make that company insolvent, or at least imperil its employees' claims against it. These claims arise from the establishment of two pension funds in favor of the employees who are alleged for this reason to be creditors of the company. The bankruptcy court allowed the Association to intervene, and it thereupon objected to the plan, not only for the reason just given, but because it was unfair to all parties concerned except one. It will be necessary to state in a little detail the relations of the various corporations concerned. ·

The Postal Telegraph and Cable Company is hardly more than a holding company; its tangible assets consist of only about $260,000, and the rest of its assets, stated in round figures, are as follows: all the common, and all but 6,000 of the preferred, shares of the "Associated Companies"; $22,700,000 · in notes and interest of the Commercial Cable Company; $29,000,000 in open indebtedness against the "Associated Companies"; and all the shares of a small company, the Postal Telegraph Sales Corporation. The "Associated Companies" is a Massachusetts trust; it is purely a holding company, and its assets consist of claims of $26,000,000 on open account against thirty-five of its own subsidiaries, grouped together as the "Land Lines"; $4,000,000 against the Commercial Cable Company, either on open account or "accrued guaranty revenue"; $1,000,000 against an English company called the Commercial Cable Company Ltd.; $7,000,000 against two other subsidiaries, not necessary to describe; all the common shares of the "Land Lines", of the Commercial Cable Company, of the Commercial Cable Company, Ltd., of the Mackay Radio & Telegraph Company of California, and of the Radio Communication Company; and 10,000 common shares (25% of those outstanding) of the Commercial Pacific Cable Company. Thus, the only financial relations of the Commercial Cable Company with either of the two "debtors" in reörganization are that the "Associated Companies" owns all its common shares, that it owes $23,000,000 to the Postal Telegraph and Cable Company, and that it owns 61,266 of the preferred shares of the "Associated Companies". The Association has no interest in the Commercial Cable Company except as a creditor through the pension claims, which in much the larger part depend upon the existence of profits and are limited by their amount. .

The plan among other things provides that the Commercial Cable Company shall transfer all its assets (with some exceptions to be noted) to a new company which shall assume its obligations (again with certain exceptions). Presumably this is to be done by the vote of the "Associated Companies", as its sole shareholder. To this part of the plan the Association does not apparently object; but it does object to the disposition of the assets which are to be excepted from the transfer. These consist of (1.), some $3,000,000 in cash, (2.), a further sum of cash not ascertainable, but apparently not important, (3.), 37,500 preferred shares in a building company, (4.), $38,000,000 of accounts, owed either by the "Land Lines", by the Radio Communications Company, Inc., or by Mackay Radio & Telegraph Company of Delaware; and, (5.), the 61,266 preferred shares of the "Associated Companies", already mentioned. The plan proposes that these assets shall be transferred in various ways, not important here, in consideration of (1.), the cancellation by the Postal Telegraph and Cable Company of its $20,000,000 of notes; (2.), of any debts of the Commercial Cable Company to the "Land Lines", (so far as we can find, there are none of these); (3.) of its obligations to the Postal Telegraph and Cable Company and the "Associated Companies", ($4,000,000 to "Associated Companies", and apparently none to the Postal Telegraph and Cable Company); and, (4.), all unpaid interest on the foregoing, which cannot be stated exactly, but which includes $2,700,000 on the notes of the Postal Telegraph and Cable Company. The Association protests that by this transfer the Commercial Cable Company will be stripped of all its liquid assets, and left only with its cables and other "wasting" property; also that there has been no adequate appraisal of the $38,000,000 of claims against the "Land Lines". Further, it asserts that the plan is in general unfair to the creditors and "security holders" of the Postal Telegraph and Cable and the "Associated Companies", and to all their subsidiaries, because at the expense of all the rest it favors the International Telegraph and Telephone Company, the shareholder of all the common, and some of the preferred, shares of Postal Telegraph & Cable Company. Finally it complains of an order of the court, extending §§ 196 and 198 of the Chandler Act, 11

U.S.C.A. §§ 596, 598, to the pending proceeding, and to the way in which consents to the plan were in consequence computed. The judge considered these objections on their merits, and after deciding that the transfer of the excepted assets was in the Association's interest, confirmed the plan.

The statute under which the proceeding is conducted—§ 77B of the Bankruptcy Act—like its successor, Chapter X, 11 U.S.C.A. § 501 et seq., is concerned with the reörganization of corporations as such, and with them alone. That does not mean that it stands upon the fictional legal person of the corporation; a reörganization may be worked out in disregard of the "corporate entity", treating the shareholders, for all but procedural purposes, as a group formed to conduct a common venture. But it does mean that the reörganization is to be confined to the readjustment of the relations between the shareholders collectively and their creditors (including relations between sub-groups of shareholders inter se and between them and creditors); and that the bankruptcy court shall not bring into a concourse the relations between the shareholders, i. e., the corporation, and third persons other than creditors. The section preserves the model of all bankruptcy by confining itself to adjustments between the bankrupt and his creditors, leaving all his legal transactions with the world at large to those tribunals that have cognizance of them generally. In harmony with this premise the statute does not therefore attempt to adjust the relations of the shareholders of a parent with the creditors of a subsidiary, even though the subsidiary be wholly owned and though its creditors are for that reason creditors of the same group of shareholders. That is entirely possible and proper, because, although the shareholders of the parent and the subsidiary are the same, the creditors are divided into two groups, their rights being against different assets. An examination of the text of the section leaves no doubt that this is its scheme. It does indeed allow a subsidiary to join in the reörganization of its parent (sub. a), but only upon filing its own petition and getting a separate approval. This would be wholly unnecessary if the subsidiary's creditors were already within the jurisdiction of the court. "Creditors" are those holding "claims", and "claims" are "debts, securities, other than stock, liens, or . other interests of whatever character" in the corporate as-

sets (sub. b); the creditor of a subsidiary has no interest in the assets of the parent except in exceptional transactions in which the subsidiary has acted as an agent or dummy. Again, notice is to be given only to creditors and shareholders; and while their interests must be solicitously guarded in the plan, no one else's need be (sub. e).

Since the Association is neither a creditor nor a shareholder of either of the "debtors", it had no standing to object to the plan, unless it may speak for the Commercial Cable Company, as preferred shareholder of the "Associated Companies". It is impossible to find any basis for allowing it so to speak. Merely as creditor it clearly had no standing; a man's creditors cannot control the conduct of his affairs while he remains solvent. Perhaps for that reason the Association asserts that the Commercial Cable Company is insolvent. The record does not show it. The value of the plant of the company as a live business is about $5,500,000 (at least that is the mean of the appraisals); neither its claims against the "Land Lines" and other subsidiaries of $38,500,000, nor its investments in the two "debtors" and in their subsidiaries of $7,500,000, have ever been appraised; its current assets are $4,000,000. Its liabilities in accounts and notes payable are $26,600,000; in current liabilities $350,000; and in pension claims (if we accept the Association's own figures) $4,700,-000, making $31,700,000 in all. Therefore, after the appraised value of the plant and the current assets have been subtracted, there remain $22,000,000 of debts to be covered by claims against, and investments in, subsidiaries of a book value of $46,000,-000. The company is solvent, unless these are in fact worth less than half their book value. Perhaps they are, but we know nothing whatever about it, and the Association had the burden upon the issue. Thus, even if insolvency were enough to give it a standing without judgment and execution nulla bona—as ordinarily it is not—it had none. Apparently this is not its ground for demanding a hearing; on the contrary, if we understand it aright, it complains that the proposed transfer will leave the Commercial Cable Company insolvent, even if it is not so today. Thus, it claims to speak as a creditor who seeks to prevent a fraudulent transfer. In the first place the record does not bear out this position on the facts. A balance sheet prepared by the Association does indeed show

a deficit of about $660,000, but a very slight analysis demonstrates its fallacy. One item alone is enough. Among the assets the plant is given a value of $3,150,000 by subtracting from an appraised salvage value of $4,042,000, $890,000 for the property of an English subsidiary. The second figure was not, however, a salvage value at all, but a live one; the difference between two such disparate items is meaningless. The fair mean for the live value of the whole plant is $5,500,000, as we have said; but it is not necessary to put it higher than $4,700,000, for at that figure the deficit disappears. The lowest appraisal of live value was $4,500,000. The Association has therefore failed to establish any footing as a simple creditor seeking to prevent a fraudulent transfer. (We do not wish to be understood as deciding in this case whether the Commercial Cable Company will be made insolvent by the transfer: we are holding that the Association is not a proper party to the reörganization anyway, and our discussion is merely incidental to that. Moreover, the record is entirely unsuited to the determination of the issue, having been made without it in mind.)

The infirmity of the Association's claim to be heard is, however, much deeper than anything we have yet mentioned. It is true that the reörganization plan can deal with the preferred shares of the "Associated Companies" held by the Commercial Cable Company; that is, it may, and should, declare what interest in the assets of the "debtors" the preferred shareholders shall have. But the bankruptcy court has no power to take the shares from their owner and transfer them to anyone else, whether for a consideration or not. It cannot force upon the Commercial Cable Company, not a party to the reörganization, a bargain, an accord and satisfaction, or whatever it may be, against its will. And this reasoning applies with even more force to the other assets which are to be transferred, since these could not possibly fall within the scope of the reörganization. It is quite true that the plan may incorporate the transfer as a condition upon its execution, just as it has done; it might make the purchase of any property from a third person such a condition. But in so doing it must accept the chance that the seller will refuse to deliver, and nothing in the order confirming the plan will coërce his will a particle. The "debtors", and the new corporation, will be in no better position as against the Commercial Ca-

ble Company because of the confirmation. We do not forget that the "Associated Companies" is the sole shareholder of Commercial Cable Company, and that it is undoubtedly upon its vote that the "debtors" rely to effect the transfer. The bankruptcy court could indeed forbid that vote and stop the transaction, and would do so, if any party to the reörganization objected and its objection were valid upon the merits. But no one has done so; only the Association objects and it is not a party. And this is equally true even though we were totally to disregard the Commercial Cable Company, and treat the "Associated Companies" as the owner of the assets which are to be transferred. The Association would still have no standing vicariously to take up a cause in the interest of those who did not choose to espouse it in their own behalf. Nor is it in the least necessary that the Association should be allowed such a privilege for its own protection, for, as we have already said, the order of confirmation will not conclude it. If the transfer is unlawful as against it, any court of competent jurisdiction will prevent its consummation; not a word said here will gainsay such a court's freedom to decide whatever it thinks best.

In what we have said we do not mean to imply that a bankruptcy judge should allow a palpable fraud to be consummated before his eyes; spoliation might be so patent and so gross that he would be bound to intervene ex mero motu. The facts at bar leave no room for the application of any such doctrine. Unless the transfer is a fraud upon the creditors of the Commercial Cable Company, they have nothing to say about it; the "Associated Companies" as shareholder alone has lawful power to pass upon the bargain. As we have seen, there is as yet no basis for supposing that a fraud will be committed; nobody can tell that without an appraisal of the assets which has not been made. It is just that inquiry which the bankruptcy court is without power to undertake, and which it should not undertake under the guise of preventing its use by the "debtors" as a catspaw. It is true that under Stoll v. Gottlieb, 305 U.S. 165, 59 S.Ct. 134, 83 L.Ed. 104, if we decided the question now, our decision would apparently be res judicata, for we should have deliberately passed upon the point. If thereafter the Association sought to challenge the transfer in a state court, it would fail; though even then the order would not be res judi-

cata against any other creditor of the Commercial Cable Company who might choose to object. But it is scarcely a justification for a court's doing what it believes to be beyond its lawful powers, that after it has done it, the result will be immune from successful challenge. True, there might be an immediate convenience in deciding the question on this imperfect record, for it is not likely that any other creditor of the Commercial Cable Company will complain. But convenience is no excuse for usurping power. Moreover, all questions of propriety and conscience aside, in the end the greater convenience will prove to be in keeping within the lawful bounds of the bankruptcy court's jurisdiction. Reörganizations are difficult and complicated enough at best; to interject into them controversies between the "debtor" and third persons not creditors, is likely to produce practical difficulties of administration outweighing anything gained by the enlarged concourse which would ensue.

 The appeal must therefore be dismissed because the Association is not a party aggrieved. The order of intervention was erroneous, and should not have been made; but it did not, and could not, create an interest in the reörganization which the Association did not have without it; it enabled the Association to appear, but it gave it no added standing to object to the plan. If the dismissal works delay in the execution of the plan, it is because the Commercial Cable Company did not itself join in the reörganization. That may well have been desirable for other reasons, but it was attended by the possibility that the transfer might be opposed by creditors of the transferrer.

Appeal dismissed.

CLARK, Circuit Judge (dissenting).

The appellant was permitted to intervene below; the facts of the controversy it presented were examined by the district judge; a decision on the merits was reached adverse to appellant's contentions. Now my brothers would dismiss this appeal, deny that a right to intervene ever existed, and command that, if ever a decision is to be had, the dispute shall be relitigated in some other court.

Such a result seems to me not in the spirit of modern procedure, which aims to view matters in their entirety, and not by separate bits, and also to put an end to litigation as promptly and completely as possible. I venture to believe that the view of intervention here suggested is quite out of keeping with the spirit of the new intervention rule of the Federal Rules of Civil Procedure (Moore and Levi, Federal Intervention, 45 Yale L.J. 565, 47 Yale L.J. 898; 2 Moore's Federal Practice, § 24.01 et seq.), and there seems no reason why the bankruptcy provision for intervention should be more narrowly construed (ibid.)[1] For in a practical sense the appellant Association here had a claim and (if its facts were true) a real grievance; its assertion was that the source of supply for the pensions for its members was being scuttled under a plan now judicially sponsored. Here where the program was being conceived and executed would seem a natural place to air the grievance. So the district court thought. It granted intervention and heard the case. Under Stoll v. Gottlieb, 305 U.S. 165, 59 S.Ct. 134, 83 L.Ed. 104, the decision below settles the matter, certainly unless we interfere.[2] Even on the surface and without going beyond the facts I have just recited, I do not believe we would be usurping power if we followed the example of Judge Coxe and considered the matter on the merits.

But I would go further and say that on analysis of the situation here presented, I believe sound reorganization practice directs us, if it does not compel us, to go that far. Perhaps the Commercial Cable Corporation is not fully bound by the court order to carry out the plan, though that is not an uncomplicated issue.[3] But this is

[1] The broad rule of the new Chandler Act, § 207, 11 U.S.C.A. § 607, permitting intervention generally or specially to a party "in interest" was in force at the time of the order below. See 2 Moore's Federal Practice 2350–2365; Moore's Bankruptcy Manual (1939) 554, 555; Teton, Reorganization Revised, 48 Yale L.J. 573, 592.

[2] The opinion herein suggests that the Stoll case will apply, if we decide the question. Yet the question has already been decided by a court prepared to take that responsibility; we must now go so far as to say that course was error to prevent the Stoll case from governing.

[3] As stated in the opinion, Commercial is a preferred stockholder of the debtor Associated, which, in turn, owns all Commercial's stock, and Commercial owes the debtor Postal roughly $23,000,000. Its stock holdings of Associated have a book value just short of $4,000,000; while substantially all its liabilities—except

primarily a controversy between the appellant Association and the debtors herein. And there are issues between these parties which it is hard for me to believe are left undetermined by the approval of the plan.

First, the Association, in addition to being a creditor of Commercial, is, at least potentially, a creditor of the debtor Associated.[4] And as such creditor, the Association should have the privilege to present its claim for the consideration of this court.

This conclusion rests upon appellant's primary position as a creditor of Commercial. Associated is the sole stockholder of Commercial. The assets of Commercial are about to be withdrawn, in a manner that appellant contends will render Commercial insolvent. These assets are to be withdrawn by and for the direct or indirect benefit of Commercial's stockholder, Associated. And when the withdrawal takes place, appellant, if correct in its arguments as to insolvency, will have a cause of action against Associated, as a stockholder withdrawing assets from an insolvent corporation.

Is it an answer to say that, although appellant may become a creditor of Associated in the future, it is not a creditor of Associated now, since the transfer has not yet taken place? If we refuse to hear appellant at this time, we will forever deprive it of any future opportunity to proceed, as a creditor of Associated, against the assets of Associated. Under § 226 of the Chandler Act, 11 U.S.C.A. § 626, "the property dealt with by the plan, when transferred by the trustee to the debtor or other corpo- ration or corporations provided for by the plan, or when transferred by the debtor in possession to such other corporation or corporations, or when retained by the debtor in possession, as the case may be, shall be free and clear of all claims and interests of the debtor, creditors, and stockholders, except such claims and interests as may otherwise be provided for in the plan or in the order confirming the plan or in the order directing or authorizing the transfer or retention of such property."[5] A reading of this section makes it plain that the assets of Associated, and also the assets of Commercial, will pass to the new corporations free and clear of all claims of appellant, in so far as appellant is conceived of as a creditor of Associated. If appellant cannot make its claim now, it can never again contend to be a creditor of Associated.

The plan makes no provision for appellant; the order confirming the plan (in the very words of the Chandler Act, § 224(1), 11 U.S.C.A. § 624(1)[6] is made binding upon "all creditors of the Debtors, secured or unsecured, whether or not such creditors are affected by the Plan, as amended, or have accepted it or have filed proofs of their claims and whether or not their claims have been approved (if filed), and whether or not their claims have been scheduled or allowed or are allowable." If appellant's claim of insolvency is valid, making it an imminent creditor of Associated, it is difficult to see why appellant is not a party aggrieved by the order of confirmation, entitled to intervene and to prosecute this appeal.[7]

for small current liabilities for taxes and wages and reserves for depreciation—run in favor of the debtors, Postal and Associated. And if Commercial respects the plan, its whole setup will be changed, with, among other things, nearly $50,000,-000 of assets book value being eliminated.

4 "Creditor" means the holder of any claim; "claims" include "all claims of whatever character against a debtor or its property, except stock, whether or not such claims are provable under section 63 [103] of this act [title] and whether secured or unsecured, liquidated or unliquidated, fixed or contingent." Chapter X, § 106(1), (4), 11 U.S.C.A. § 506(1, 4). Compare 77B, sub. b(10), 11 U.S.C.A. § 207, sub. b(10). See Gerdes, Corporate Reorganizations, § 1044; Foust v. Munson S. S. Lines, 299 U.S. 77, 82, 57 S. Ct. 90, 81 L.Ed. 49. But cf. In re Pru- dence Bonds Corp., 2 Cir., 79 F.2d 212, 215, semble.

5 This is apparently but a succinct statement of the scattered provisions of 77B, in subs. g and h, 11 U.S.C.A. § 207 subs. g, h.

6 Compare 77B, sub. g, 11 U.S.C.A. § 207, sub. g. The provisions of the Chandler Act, Chapter X, apply to proceedings wherein the petition was approved more than three months before the statute's effective date "to the extent that the judge shall deem their application practicable." § 276, sub. c(2), 11 U.S.C.A. § 676, sub. c(2).

7 Appellant's claim should not be prejudiced by reason of the fact that it was not in existence at the commencement of reorganization proceedings. Appellant's position is fairly analogous to that of a claimant under a tort committed during the administration of the estate. Such a

Second, even if it has no immediate standing as a creditor of Associated, appellant nevertheless should be held to have a presently mature right to be heard in this proceeding. No matter how scrupulously we observe the niceties of corporate entities, it cannot be gainsaid that Associated owns all the stock of Commercial and is about to vote that stock in favor of the allegedly fraudulent transfer. The plan, which contemplates the transfer, has been confirmed; the order of confirmation authorizes the ·debtors, including Associated, to "take all action necessary to carry out the Plan under all applicable State and Federal laws." What further order or justification does Associated need to vote its Commercial stock? Appellant, even as a mere creditor of Commercial, is aggrieved by an order allowing Associated to vote its Commercial stock in favor of an allegedly fraudulent transfer. Appellant would have the right to enjoin this threatened transfer in any competent tribunal. If it sued to enjoin Commercial, perhaps the district court would have no jurisdiction to exercise compulsion upon Commercial in this action.[8] But when appellant asks the reorganization court to prevent Associated from voting its Commercial stock, as Associated so clearly threatens to do, it would seem that that court possesses jurisdiction of the most complete sort. It is certainly in a position to command the debtor Associated to do whatever it wishes the debtor to do.[9] If the district court has granted Associated leave to vote its stock in favor of a fraudulent transfer which will, when completed, make this appellant a remediless creditor of Associated, then this appellant has sufficient standing to request that it examine his claim on the merits and determine whether a fraudulent conveyance will in truth occur, and standing, therefore, to request that we review the determination so made.

Third, appellant will also be entitled to pursue the assets of Commercial into the hands of the threatened transferees—the new corporations to be formed under the aegis of the reorganization court. If appellant is or will be entitled to any relief against the new corporations, it should be within the power of that court to grant that relief. It is no answer to say that jurisdiction is absent because we cannot also bind Commercial. It is not necessary to bind Commercial. We can bind Associated and we can bind the new corporations. We can also bind appellant to whatever ruling is made on the merits. The cause of action should not fail if Commercial, one of several parties, is beyond the jurisdiction of the court. Appellant will be entitled to injunctive relief against all or any one of the parties to the contemplated transfer, if we will give it a chance to prove and it does prove the transfer fraudulent.[10]

If jurisdiction exists, the convenience of settling the matter seems evident. The decree below, for better or worse, settled all matters and gave the new plan a chance to survive. Now we cast a shadow upon it. The result helps neither side, for it is in the interest of all to settle these problems. True, reorganization proceedings are most complicated. But we are not·making them less so by forcing into some other court litigation which practically must be settled before the plan can be put into unjeopardized execution. It seems to me far more cumbersome to separate this matter from the necessarily comprehensive reorganiza·tion proceedings and send it to some other court rather than to dispose of all matters in a single proceeding. The reorganization court must pass on the feasibility of the plan. Cf. Case v. Los Angeles Lumber Products Co., Ltd., 308 U.S. 106, 60 S. Ct. 1, 84 L.Ed. ——, Nov. 6, 1939. To arrive at an intelligent decision on feasibility, the district judge must have weighed the issue whether a fraudulent conveyance was about to occur, and the likelihood of a suit in another court tying up the execution of the plan. And conversely, when appellant, as it is now ordered, proceeds to seek its remedy elsewhere, the court selected will be utterly unable to determine the exist-

claimant would have a preferred charge on the assets of the debtor. Gerdes, Corporate Reorganizations, § 1180. Cf. § 77, sub. n. of the Railroad Reorganization chapter, 11 U.S.C.A. § 205, sub. n.

[8] Unless and to the extent that Commercial may be bound by the decree herein. See note 3 supra.

[9] In fact, the reorganization court could enjoin the commencement of a suit against Associated in any other court. Chapter X, § 116(4), 11 U.S.C.A. § 516(4). See Foust v. Munson S. S. Lines, supra.

[10] Threatened injury is then imminent if it proves not that Commercial must make the transfer, but only that Commercial threatens to make it. That the most immediate threat exists is readily apparent.

ence of a fraudulent conveyance unless it probes deep into the involved corporate network now being reorganized here. The voluminous data this other court will need are already in evidence in our own reorganization litigation. In future proceedings subject to the Chandler Act, the reorganization court will have the great benefit in cases of this kind of a report on the plan by the Securities and Exchange Commission. Chandler Act, §§ 172–174, 11 U. S.C.A. §§ 572–574.[11] Congress has thus pointed a way to making reorganization less complicated for the courts; but we, I fear, are turning in another direction.

Although we are nominally limited to the 77B petitions of two holding companies located in the Southern District of New York, we should realize that, no matter how we restrict our jurisdiction, we are in fact about to place some sort of judicial approval—more or less—upon the financial reorganization of a world-wide communications enterprise, involving some forty-odd corporations and hundreds of millions of investors' funds. When a creditor of one of the many subsidiary corporations comes to the district court for relief, it seems idle to answer that his particular subsidiary corporation has filed no petition under 77B. Whether or not the subsidiary is being reorganized under a 77B petition pending below, the subsidiary is being reorganized for all practical purposes. Those who are reorganizing it have filed petitions in the court and can be made answerable to the court for any wrongs they are threatening to do to appellant.

I appreciate that the task of adjudication is a difficult one for an appellate court in circumstances such as are here presented. To disapprove of a plan so extensively supported as this is may perhaps deprive a great business of its only chance of future survival. Perhaps, too, a going concern, like the cable lines here, must be expected to contribute from its strength to its weaker sisters when a new start is made. It is difficult, indeed, to determine the point at which overgenerosity begins. Personally I am happy to be relieved of the burden of judgment, even against my convictions, but I cannot believe avoidance of that responsibility is really open to us on this rec-

ord. Perhaps the record is too meager to decide the point appellant wishes to make, though I am not clear what new evidence can be produced and the Association was ready to stand on the record made. But if too meager, the remedy is to send it back to be completed, not to dismiss the appeal. Actually the record is being used to reach a decision, to wit, that no threatened insolvency of Commercial is disclosed, but only for the purpose of disclaiming jurisdiction. I believe decision should be made for the purpose of finally settling the litigation. Accordingly I believe the appeal should be disposed of on the merits.

---

[11] Indeed, it would seem that the Commission could have been most helpful in reporting on this plan, so extensive and far-reaching in nature. But the plan was dated "as of" September 21, 1938, one day before the Chandler Act became effective, although the supporting contracts were dated September 29, 1938; and the judge declined to apply the Act in full to those proceedings, though appellant so requested and now appeals from the refusal.