**SECURITIES AND EXCHANGE COMMIS-
SION v. LONG ISLAND LIGHTING CO.**

No. 233.

Circuit Court of Appeals, Second Circuit.

Feb. 23, 1945.

Writ of Certiorari Granted March 26, 1945.

See 65 S.Ct. 869.

Judgment Vacated April 30, 1945.

See 65 S.Ct. 1085.

Roger S. Foster, Sol., Morton E. Yohalem, Counsel, Public Utilities Division, David K. Kadane, Sp. Counsel, Public Utilities Division, Theodore L. Thau, Sp. Counsel, Harry G. Slater, and Solomon Freedman, all of Philadelphia, Pa., for the Securities and Exchange Commission.

Milton Pollack, of New York City, amicus curiae for preferred stockholders.

William A. Lockwood, of New York City, for New York Curb Exchange, amicus curiae.

Harold R. Medina, Charles G. Blakeslee, and Charles E. Elbert, all of New York City (John J. Donohue, of Albany, N. Y.,

and Richard T. Davis, of New York City, of counsel), for appellee.

Before HUTCHESON, SIMONS, and CLARK, Circuit Judges.

SIMONS, Circuit Judge.

The appellant sought temporary and permanent injunctions restraining the appellee from consummating a plan for its recapitalization until determination of proceedings pending before the Commission, involving the status of the appellee under the Public Utility Holding Company Act of 1935, 49 Stat. 803, 15 U.S.C.A. § 79 et seq. The District Court denied the preliminary injunction on the ground that it lacked power to grant the relief sought. A temporary restraining order pending hearing, having been dissolved, a judge of this court granted a temporary restraining order pending hearing on the appeal.

The Commission sought protection by the District Court in the carrying out of duties asserted to devolve upon it under the Public Utility Holding Company Act, by enjoining the appellee from taking further steps to effectuate a plan of recapitalization, until in an administrative proceeding before it, it was determined whether rights sought to be affected by the plan should be subjected to the reorganization standards of § 11 of the Act. The specific action sought to be enjoined is the overprinting of existing certificates for preferred stock and the issuance of new common stock, and the nature of the relief sought is the preservation of the status quo.

The appellee is a holding company as defined in § 2(a) (7) of the Act, but exempt from the registration and regulatory provisions of the Act by an order of the Commission dated March 27, 1936. That order is, by its express terms, subject to revocation after hearing and a finding by the Commission that the circumstances which gave rise to its issuance no longer exist. The exemption is authorized by § 3(a) of the Act and may be revoked in pursuance of § 3(c).

On November 4, 1944, a petition was filed with the Commission by the preferred stockholders of the appellee, which led to the institution of proceedings by the Commission on November 10, to determine whether the exemption should be in whole or in part revoked. The stockholders represented that the appellee was endeavoring to effectuate a recapitalization plan unfair to them and had engaged in activities which burdened interstate commerce and the means and instrumentalities of interstate commerce. On November 21, 1944, the Commission instituted a separate proceeding under § 2(a) (7) (B) of the Act, for the purpose of determining whether certain persons or corporations owning or controlling substantial amounts of outstanding common stock of the appellee, exercised such a controlling influence over its management or policies as to make it necessary, in the public interest and for the protection of investors or consumers, that the appellee be subjected to the obligations, duties, and liabilities imposed by the Act. On November 22 the two proceedings were consolidated and a hearing ordered for December 19, which, for reasons presently appearing, was not held. It is asserted that if it should be determined that the exemption granted to the appellee be revoked or modified, the consequence would be that the promulgation and consummation of the plan of recapitalization would then be subject to the jurisdiction, scrutiny, and approval of the Commission under the applicable standards of the Act.

On December 18, prior to the date set for hearing, it came to the Commission's attention, through the press, that the appellee was undertaking to consummate a plan under New York law without awaiting a determination whether it would be permitted to continue to enjoy its exemption, or whether it would be required to register as a holding company, or be subjected to the supervision of the Commission, and the present proceeding was at once begun to restrain such consummation.

Prior to its inauguration, the stockholders of the appellee had voted in favor of a plan of recapitalization proposed by its management, and on February 29, 1944, pursuant to requirements of the Stock Corporation Law, Consol. Laws, c. 59, and the Public Service Law, Consol. Laws, c. 48, of the State of New York, it was submitted to the Public Service Commission of New York. After extensive public hearings from March through September, the recapitalization plan was approved by the State Commission on December 14, 1944. By law, that Commission is required to withhold approval unless it finds that the plan is in the interest of investors. Rochester Gas & Electric Corp. v. Maltbie, 284 N.Y. 626, 29 N.E.2d 936. The appellee promptly filed its certificate of recapitaliza-

tion together with the order of approval, in the office of the Secretary of the State of New York, in pursuance of the Stock Corporation Law. The plan became effective upon such filing (General Corporation Law, Consol. Laws, c. 23, § 8), the rights of the stockholders under the corporate structure thereupon came to an end, trading in the old stock ceased on the New York Curb Exchange on December 16, and trading in the new stock commenced on December 18. On December 19 the appellee was ordered to show cause why a preliminary and permanent injunction should not be entered restraining it from carrying out the recapitalization plan, and concurrently the temporary restraining order issued. Because of it and the order out of this court compelling further restraint pending hearing on appeal, the appellee says it is now a corporation without stockholders and unable to do any of the things which, by state law, require the approval of stockholders.

The court, without determining whether a case had been made out for equitable relief by a showing of irreparable harm if the injunction should be withheld, and without considering whether state law provided a remedy to the preferred stockholders which they failed to invoke, denied the relief sought solely upon the ground that the Commission was without power, conferred upon it by the Act, to seek, and the court without power, because of limitations upon its jurisdiction, to grant it.

The Commission bases its appeal mainly, if not solely, upon the asserted legal principle that a federal court has power, upon the application of an administrative agency before which an administrative proceeding is pending, to preserve the status quo until such proceeding is concluded. The necessity for the preservation of such status is sought to be demonstrated by argument that if further steps are taken by the appellee to consummate its recapitalization plan, the rights of preferred stockholders will be broken up into new preferred and common shares in distributable form, and it might become impossible to adjust their rights on a basis which would adequately reflect existing equities. Trading in the new common stock would cause intervening equities in the purchasers to arise, and there would be serious doubt that the new stock could once more be separated so as to permit fair treatment to all security holders. In any event, trading in Long

Island securities would be upon a misleading basis and there would be substantial difficulties in achieving the fair and equitable result contemplated by the Act.

The Commission asserts, however, that it does not rely for its authority to seek relief, upon any specific grant of the statute. It disclaims reliance upon § 18(f) as a basis for the jurisdiction of the court, for that section grants it authority to bring an action in a proper district court of the United States only for acts or practices which constitute or will constitute a violation of the provisions of the Act, or of any rule, regulation, or order thereunder, and it concedes there have been no such violations. It plants itself squarely upon the general equity powers of District Court under § 24 of the Judicial Code, 28 U.S. C.A. § 41, which extend, inter alia, to all suits of a civil nature at common law or in equity, brought by the United States or by any officer thereof authorized by law to sue. In support of its position it argues that the various branches of the federal government have certain implied and inherent powers which will be exercised, where appropriate, to protect the proper functioning of another branch of the government, that preservation of the status quo pending determination, is a traditional aspect of equity jurisdiction, and that the circumstances of the present case amply warrant its exercise to prevent circumvention of the Commission's jurisdiction under the Holding Company Act. It deems it an unnecessary refinement to determine whether particular cases relied on rest upon the fact that the action is brought by the United States or by an officer thereof authorized to sue, or upon the existence of a federal question, or upon the ground that the case falls within § 24(8) of the Judicial Code applicable to "all suits and proceedings arising under any law regulating commerce." In seeking injunctive relief the Commission asserts it is asking the court to exercise the same kind of jurisdiction which a federal court would employ to protect its own jurisdiction, and to preserve a status quo pending proceedings before another tribunal.

The cases relied upon, however, which sustain the right of a federal equity court to preserve a status quo pending proceedings before it or another tribunal, are mainly those in which restraint is sought to protect a jurisdiction otherwise acquired. Such are the bankruptcy cases, typified by

Continental Illinois Nat. Bank & Trust Co. v. Chicago, R. I. Co., 294 U.S. 648, 55 S.Ct. 595, 79 L.Ed. 1110, and equity receivership cases, such as Graselli Chemical Co. v. Aetna Explosives Co., 2 Cir., 252 F. 456. No case has been cited to us, and none has been found, where a federal court has undertaken to protect by injunction a jurisdiction not presently existing, merely because upon speculative and problematical circumstances, such jurisdiction may at some uncertain time in the future, arise.

The Commission leans heavily upon Securities and Exchange Commission v. U. S. Realty & Improvement Co., 310 U.S. 434, 60 S.Ct. 1044, 84 L.Ed. 1293, as a compelling precedent. There the respondent brought reorganization proceedings under Chapter XI of the Bankruptcy Act, 11 U.S.C.A. § 701 et seq. Chapter X, 11 U.S.C.A. § 501 et seq., also provides for reorganization, but permits participation by the Securities & Exchange Commission in proceedings in the District Court. The Commission was allowed to intervene in the Chapter XI proceeding on the ground that it is charged with the performance of important public duties under Chapter X, which will be thwarted if a debtor may secure adjustment of his debts under Chapter XI. The Court found that the Commission's duty and its interest extends not only to the performance of its prescribed functions where a petition is filed under Chapter X, but to the prevention, so far as the rules of procedure permit, of interference with their performance through improper resort to Chapter XI proceedings in violation of the public policy of the Act which it is the duty of the court to safeguard. Such permissive rule of procedure was found to be Rule 24 of the Rules of Civil Procedure, 28 U.S.C.A. following section 723c, made applicable to bankruptcy proceedings by para. 37 of the General Orders in Bankruptcy, 11 U.S.C.A. following section 53. By it a party may be permitted to intervene in an action when its claim or defense and the main action have a question of law or fact in common. This provision dispenses with any requirement that the intervenor shall have a direct, personal, or pecuniary interest in the subject of the litigation.

The right to intervene, however, does not imply a right to bring an original suit, Sprunt & Sons v. United States, 281 U.S. 249, 255, 50 S.Ct. 315, 74 L.Ed. 832; Pittsburgh & W. Va. R. Co. v. United States,

281 U.S. 479, 50 S.Ct. 378, 74 L.Ed. 980. In the U. S. Realty Co. case jurisdiction of the court was originally invoked in the exercise by it of the bankruptcy power conferred upon a court of bankruptcy by §§ 74, 75, and 77 of the Act of March 3, 1933, 11 U.S.C.A. §§ 202, 203, 205, to which Chapters X and XI have succeeded. Under those sections, if the petition be approved, the court, during the pendency of the proceedings, is given exclusive jurisdiction of the debtor and its property wherever located, and it is not necessary to its validity that the proceedings should result in an adjudication of bankruptcy. Continental Illinois Nat. Bank & Trust Co. v. Chicago R. I. Co., supra. It is, of course, established doctrine that a federal court, having first acquired jurisdiction of the subject matter, may enjoin parties from proceeding in other courts where the effect of the action would be to defeat or impair the jurisdiction of the federal court, Kline v. Burke Const. Co., 260 U.S. 226, 229, 43 S.Ct. 79, 67 L.Ed. 226, 24 A.L.R. 1077, but we fail to perceive its aid to the Commission, even though it extends to the protection of proceedings before an administrative tribunal.

The subject matter involved in the Commission's proceeding, was a determination whether to take jurisdiction over Long Island. It had previously exempted it. To say that it was seeking to protect a jurisdiction, which once it had renounced and was now undertaking to regain, is a contradiction in terms. The Commission has presently no regulatory or supervisory control over Long Island, no duties with respect to it, save only an inquiry whether an exemption is to be revoked, which the Commission concedes it may not appropriately prejudge. It has no jurisdiction over Long Island to be protected, and may draw such jurisdiction to itself only by a finding, after hearing, that circumstances which gave rise to the exemption, no longer exist, and by the promulgation of an order of revocation. This it has not done, and may never do.

■ Pennsylvania v. Williams, 294 U.S. 176, 55 S.Ct. 380, 79 L.Ed. 841, 96 A.L.R. 1166, is urged upon us as authority for holding that a governmental agency may have judicial aid by a stay of judicial proceedings which would interfere with its administrative functions. There the state intervened in a receivership proceeding in a federal court, praying that federal receiv-

ers be required to surrender the assets of a corporation to a state agency for liquidation under state law. The court required the District Court to discharge its receivers and direct them to surrender the property to the state commission which had commenced proceedings for the winding up of the association, under state law. This is again an intervention ancillary to validly acquired jurisdiction over the property of the association. We do not perceive it to be authority for a holding that in this case the court should have interfered with the action of the New York Commission at a time when the appellant was without jurisdiction over Long Island. Moreover, the Williams case points out that it has long been accepted practice for the federal courts to relinquish their jurisdiction in favor of state courts where its exercise would involve control of or interference with the internal affairs of a domestic corporation, and that there are stronger reasons for adopting a like practice where the exercise of jurisdiction involves an unnecessary interference by injunction with the lawful action of state officers, citing Matthews v. Rodgers, 284 U.S. 521, 525, 52 S. Ct. 217, 76 L.Ed. 447. This is but another aspect of the doctrine that federal courts will carefully observe constitutional limitations upon their jurisdiction, and avoid unnecessary interference with state action. The principle is illuminated for present purposes by Board of Railroad Com'rs v. Great Northern R. Co., 281 U.S. 412, 50 S.Ct. 391, 396, 76 L.Ed. 936, where it was held that under the Interstate Commerce Commission Act the courts have no authority to prevent a carrier, by injunction, from putting into effect allegedly unfair intrastate, rates until the Commission has a chance to determine their validity. "A judicial restraint of the enforcement of intrastate rates, although limited to the pendency of proceedings before the Interstate Commerce Commission, is none the less essentially a restraint upon the power of the state to establish rates for its internal commerce, a power the exercise of which in prescribing rates otherwise valid is not subject to interference upon the sole ground of injury to interstate commerce, save as Congress has validly provided. Congress has so provided only in the event that, after full hearing in which the state authorities may participate, the Interstate Commerce Commission finds that unjust discrimination is created." It was also said that "the question whether there is injury, and what the measures shall be to prevent it, is committed for its solution preliminarily to the Interstate Commerce Commission." It would seem, therefore, that the court in the present case may not interfere with the domestic affairs of a state corporation seeking reorganization or recapitalization under state law, until by formal action of the Commission it was brought within the jurisdiction of the Act which alone created the Commission, and from which it alone derives authority.

 While the Commission does not base its suit for relief upon any express authority conferred upon it by the Act, but rests its case upon the general equity powers of a federal court, it is not without importance that, by the terms of the Act which purports to provide for a comprehensive scheme for control of practices by public utility holding companies and affiliates affected with a national public interest, the Congress conferred upon the Commission in § 18(a) and § 11(d), the power to invoke the aid of the courts only to prevent evasions of the Act and non-compliance with the orders of the Commission. There is concededly no power to restrain or discipline holding companies exempt from its provisions. It would seem, therefore, that the guide to statutory construction in the maxim expressio unius exclusio alterius, is applicable. Express powers are generally construed to be in negation of powers not expressly granted, and the application of the maxim here is not such an unwarranted use thereof as it was found to be in the Continental Illinois Nat. Bank & Trust Co. v. Chicago R. I. Co., supra, where it required other provisions of law to be ignored.

 The appellee was exempted from the provisions of the Public Utility Holding Company Act; it has violated no law; it has disobeyed no order or regulation of the Commission. Finding itself in a critical situation in respect to the maturity of its securities, and in need of some change in its corporate structure, it applied for relief to the only agency authorized to grant it, namely, the Public Service Commission of the State of New York, with the sanction of its stockholders. There is no contention that it acted unlawfully; there is no requirement of law that obliged it to advise the appellant of the proceedings before the New York Commission, or of that body's favorable action upon its application. That

its endeavor was precipitous may or may not have been in pursuance of its need— of that we are not advised. The Commission says that it did not overlook the possibility of its issuing a summary order under the residual powers conferred upon it by § 20(a) of the Act, giving it authority from time to time to issue, amend, and rescind its rules and regulations, but that it seemed to it more consonant with traditional doctrines to rely upon the courts rather than upon an administrative agency itself for interlocutory relief, and advises us again and again that it has been careful not to prejudge the merits of the plan. It asserts, nevertheless, that the basis for its application for equitable relief was the conviction that a very serious question is presented as to whether the plan conforms to standards of the Act designed to protect the public interest, and alleges that there is serious doubt whether, if presented to the Commission, the plan would be found to meet the standards prescribed by Congress for the protection of investors. But no question in the collective mind of the Commission can give rise to a justiciable controversy, nor may its pronouncements, policy, or program, save as they have fruition in action of a definite and concrete character constituting an actual or threatened interference with the rights of others, for the judicial power does not extend to the determination of abstract questions. Ashwander v. Tennessee Valley Authority, 297 U.S. 288, 324, 56 S.Ct. 466, 80 L.Ed. 688.

 The Commission argues that because of the extraordinary complexity of the programs dealt with, and the fact that the holding company device has become so largely a mechanism for circumventing legal restraints, it is especially important that the Act be given a broad and flexible construction; that in view of the public purpose to be served, it would seriously impair or limit its accomplishment if the presently sought remedy were withheld, and that there must be an inter-play of functions on the part of both agencies and courts, in preventing the Act from being circumvented or evaded by methods which could not be foreseen and specially provided for. Undoubtedly these broad aspects of the matter must weigh heavily with courts of equity, but while courts have upon occasion bridged gaps in the law by construction when compelled by clearly expressed legislative purpose, yet "judicial law-making should always be cautiously employed and should be severely restricted in scope." New England Coal & Coke Co. v. Rutland R. Co., 2 Cir., 143 F.2d 179, 189.

If it be said that a proceeding for reorganization or recapitalization under state law by an exempt corporation may, for all practical purposes, nullify the power of the Commission to exercise its rights and fulfill its duty to revoke the exemption, it may also be said that an over-riding authority to revoke at any time leaves an exempt corporation completely helpless, if in times of financial stress it becomes necessary to reform its capital structure. It may not submit its plan of reorganization to the Commission because it is not subject to the authority of the Commission, and its exemption may have value to it or to new investors which neither its directors nor stockholders may be willing to surrender. It may not, except at its peril, resort to the remedial provisions of state law, for if it does the Commission, upon the petition of any disgruntled stockholder or group of stockholders, may, by a proceeding such as this, invoke the strong arm of a court of equity between plan and its consummation without regard to the exigency or to the effort and cost that may have been expended in formulation. We cannot but conclude that the Congress, either deliberately or by indirection, left unoccupied an area of supervision and control by the Commission. It is neither a novel nor unexpected result. In the difficult task of framing legislation to reach newly sensed evils in a complicated social, economic, and financial organization, the finite intelligence of the Congress may not always foresee all of the situations that may arise which call for supervision and regulation. The classical illustration derives from our endless succession of tax laws, and the distinction which the courts have drawn between tax evasion and tax avoidance. For the former the law provides its own discipline—for the latter, resort must again be had to the Congress.

 The Commission, by supplemental memorandum, requests that in the event of affirmance of the order below, it may have a reasonable opportunity to examine our decision in order to determine whether it should apply for a rehearing or seek further review, and so requests such further stay as may be necessary in that connection. We consider the problem here resolved not free from doubt, and that it is

258

within our power to stay proceedings notwithstanding anything that may have been said in Virginian R. v. United States, 272 U.S. 658, 672, 47 S.Ct. 222, 71 L.Ed. 463, et seq. The presently operative restraining order will be continued until mandate shall have issued.

The order below is affirmed.

HUTCHESON, Circuit Judge (concurring specially).

I concur in all that is said in Judge SIMONS' excellent opinion. I think, though, that the short and simple answer to appellant's claim of jurisdiction is to be found in the fact that Section 25[1] of the Public Utility Holding Company Act, 15 U.S.C.A. § 79y, which defines the jurisdiction of the federal courts with respect to suits brought by the commission does not grant jurisdiction of a suit of this kind. I write this brief concurrence to say so. I think it may not be doubted that this section and Sections 11(d) (e) (f) and 18(d) (f), which state the circumstances and the manner in which the commission can apply to the courts for relief, were intended to be, and are, as to jurisdiction, both inclusive and exclusive. A word by word examination of these sections makes it clear that nothing in them authorizes the suit here brought. Indeed, the commission in its brief disclaims them as the jurisdictional basis of the suit. In my view, this disclaimer, in the light of the settled rule of law that a statutory scheme intended to be all inclusive must be treated as exclusive also, settles the controversy against the commission. For it is of the essence of such a scheme that what is not included is excluded.[2] The commission, therefore, in asserting a roving commission to sue for, or as, the United States, cf. In re Debs, 158 U.S. 564, 15 S.Ct. 900, 39 L.Ed. 1092, finds itself confronted with the difficulty, inherent in efforts to induce a court of special jurisdiction to embark upon the exercise of jurisdiction, vague in its generality, and general in its vagueness. But this is not all. It finds itself confronted with the difficulty of attempting to sue out of the character with which the law has invested it, of invoking a jurisdiction beyond that to which the statute, by especially defining, has limited it. It seems quite clear to me that unless we are now to abandon in favor of notions completely alien to our system of law, the settled doctrines of federal jurisdiction and of statutory construction prevailing here, we must say: that the commission is the creature of statute; that it lives and moves and has its being by statutory authority alone, and only within statutory confines; that the creature may not say to its creator, "Why hast thou created me thus?"; and that the commission may not, therefore, by any kind of mysterious metempsychosis, become disembodied from, and disenthralled of, the statute which gives it life, to sue not as creature but as creator, in short, as the United States itself. Because then the statute of its creation does not grant, but in effect denies, the jurisdiction invoked, I am in no doubt that the district judge was right and that his judgment should be affirmed.

---

[1] Section 25 provides:

"The District Courts of the United States, the Supreme Court of the District of Columbia, and the United States courts of any Territory or other place subject to the jurisdiction of the United States shall have jurisdiction of violations of this title or the rules, regulations, or orders thereunder, and, concurrently with State and Territorial courts, of all suits in equity and actions at law brought to enforce any liability or duty created by, or to enjoin any violation of, this title or the rules, regulations, or orders thereunder. Any criminal proceeding may be brought in the district wherein any act or transaction constituting the violation occurred. Any suit or action to enforce any liability or duty created by, or to enjoin any violation of, this title or rules, regulations, or orders thereunder, may be brought in any such district or in the district wherein the defendant is an inhabitant or transacts business, and process in such cases may be served in any district of which the defendant is an inhabitant or transacts business or wherever the defendant may be found. Judgments and decrees so rendered shall be subject to review as provided in sections 128 and 240 of the Judicial Code, as amended (U.S.C. title 28, secs. 225 and 347), and section 7, as amended, of the Act entitled 'An Act to establish a court of appeals for the District of Columbia', approved February 9, 1893 (D.C.Code, Title 18, Sec. 26). No costs shall be assessed for or against the Commission in any proceeding under this title brought by or against the Commission in any court."

[2] Posey v. Tennessee Valley Authority, 5 Cir., 93 F.2d 726; Tennessee Valley Authority v. Kinzer, 6 Cir., 142 F.2d 833; Breeding v. Tennessee Valley Authority, 243 Ala. 240, 9 So.2d 6.

CLARK, Circuit Judge (dissenting).

Public Utility Holding Company Act of 1935, § 3(a), 15 U.S.C.A. § 79c (a), authorizes the Securities and Exchange Commission to exempt certain holding companies of a predominantly intrastate character from the provisions of the Act, "unless and except insofar as it finds the exemption detrimental to the public interest or the interest of investors or consumers"; but under § 3(c), it "shall" revoke the exemption whenever, on its own motion or upon application of a company involved, it "finds that the circumstances which gave rise to the issuance of such order no longer exist." This power and duty of revocation was stressed by the S. E. C. in granting exemption to this defendant in 1936.[1] Just as the S. E. C. was about to proceed to a scheduled hearing of petitions for revocation of the exemption, defendant, assuming to proceed under authority of a hesitant decision of the State Public Service Commission, took precipitous action to put into effect a plan of recapitalization which would change the status of the preferred stockholders—the very matter at issue in the proceedings pending before the S. E. C. That this action, if not restrained, would indubitably scramble the interests of these stockholders, perhaps beyond recall, is obvious; that it is the duty of the S. E. C., upon a finding that the conditions rather strongly indicated prima facie do exist, to attempt to unscramble them notwithstanding any obstacles placed in its way seems equally obvious. This duty is certainly not made less insistent by the Supreme Court's solicitude for the observance of security priorities under this Act, shown once again in Otis & Co. v. S. E. C., 65 S.Ct. 483. Nor, indeed, is it lessened by the constitutional overtones apparent by the decision and already introduced into this case

by the contention of the preferred stockholders before the State Commission, which that Commission did not attempt to resolve.

Hence the need of the preventive protection of equity is great; such scrambling and unscrambling of securities can do hardly any one any real good and may do innocent investors, lacking inside knowledge, quite grievous harm. In fact, the only ones who may gain from the company's actions, outside of those frankly speculating or betting on the outcome, are seemingly the management and the common stockholders, who alone can vote and for whom the management is acting. But these, too, can profit only to the extent that presenting a fait accompli to the S. E. C. may discourage that body from further activity. Its past record of assiduity in protecting the public interest suggests that even the hope of such a consequence may be in vain.

My brothers' opinion tends to give the picture of an orderly proceeding under state supervision rudely interrupted by the attempted interference of a federal agency to vindicate in an academic way a power which it has not invoked and may never wish to utilize. Since the issue below was strictly limited to one of power and jurisdiction alone and the S. E. C. with great circumspection has attempted to avoid prejudging the issues which may later come before it, the weight of the case against the defendant is perhaps unimportant at this stage of the proceedings. But denial of relief has been rested to a considerable extent upon what is concluded to be the vagrant nature of the federal interest herein. Hence I deem it necessary to emphasize how differently this matter appeared to the State Commission itself than as here stated. That Commission's criticism of the

---

[1] Thus, after citing the statutory provision, § 3(c) supra, it appropriately said: "The provisions of Section 1(c) and 3(d) are also sufficient to authorize the Commission to modify or amend its order if it shall find that the exemption is detrimental to the public interest, or that of investors or consumers, by reason of any activities of the applicant or of any such subsidiary company in interstate commerce, or directly affecting or burdening interstate commerce. Of course, no such revocation or modification of the order can be made without first giving the parties in interest due notice and opportunity for

hearing." 1 S.E.C. 345, 346, 1936. Inequitable distribution of voting power was held by the Commission to be a ground for refusing exemption under this section in In re Niagara Hudson Power Corporation, Holding Co. Act of 1935, Release No. 5115, June 20, 1944; cf. Ecker v. Western Pac. R. R. Corporation, 318 U.S. 448, 474, 63 S.Ct. 692, 87 L.Ed. 892; Okin v. S. E. C., 2 Cir., 145 F.2d 913. In the present case the Commission was also acting under § 2 (a) (7) (B), petitions under the two sections being consolidated for a single hearing.

defendant for voting huge dividends to the common stockholders in the past and for denying representation to the preferred stockholders, notwithstanding that their dividends were greatly in arrears, its regret at its own lack of power to rectify the situation, and its final vote of only three in favor of what appears hardly more than a washing of its hands of the matter, over the protest of its able chairman and another commissioner deploring action while matters were "in a crucial stage before the Securities and Exchange Commission," amount to an excoriation of the officers and management which I should have thought they would have wished to show undeserved at the earliest opportunity

possible. And certainly no better forum could have been offered them than that of the scheduled hearing before the S. E. C. The support which defendant appears to draw from the State Commission's action seems somewhat odd; for that action is almost a direct invitation or appeal to the S. E. C. to afford the relief the State agency cannot.[2]

Again the opinion stresses the difficulty under which an exempted company must operate if it must fear the renewed control of the S. E. C. at any time. I cannot avoid the feeling that practically this is an exaggeration of conditions; in daily life milk producers still seem to operate, notwithstanding numerous city health require-

---

[2] On July 27, 1944, the Commission through Chairman Maltbie rendered an opinion with these significant passages (quoted in the complaint herein):

"It is quite apparent that the common stockholders do not intend that the management and control of the company shall pass out of their hands, regardless of the equities of the situation. But if they sincerely believe that the plan will actually deprive the interests which have controlled the company of their control in the future, what objection do they have to giving all stockholders voting rights in proportion of their claims against the company?.

"The power of the Commission to remedy this condition directly is nil. The Security and Exchange Commission has dealt rather summarily with such conditions in companies under their jurisdiction, but we have no power to compel a company to readjust its stocks or voting rights in accord with what is considered sound finance and equitable considerations. We can only approve or disapprove, pointing out the facts and the regards in which any proposal fails to deal justly and wisely with the interests affected. Counsel for the company argues that they have 'made a sacrifice' because they could have sold their stock prior to the stockholders' meeting of April 25, 1944 for at least eleven sixteenths dollar per share and received $8.25 for 12 shares (brief p. 11), whereas under the proposed plan each holder of 12 shares is to receive only $5.00 stated value in new common stock. The extent to which the common stockholders could properly claim the offer is magnanimous and is a sacrificial offering may be open to debate. Having received in recent years four times the stated value of their common stock which would have been more than sufficient to

pay all arrearages on the preferred stock, it hardly behooves them to assert their great virtue. If they had had as much consideration for the preferred stockholders as they purport to have now, the company could have avoided the non-payment of preferred dividends for six years."

Another opinion, dated October 17, 1944, and adopted December 14, 1944, with Chairman Maltbie and Commissioner Burritt not voting for the reasons stated in the text, went into the "Inadequate Participation by Preferred Stockholders," the limited steps taken to meet the problem, and the question raised whether it would be better to abandon the plan altogether or accept what was proposed. In deciding upon the latter it said that the proposed plan was a step in the right direction from the standpoint of the consumer and that it did place the company's financial structure upon a more stable basis. Continuing it said: "However, from the standpoint of preferred stockholders, the plan leaves much to be desired. But the Legislature has not given this Commission the power to formulate a new plan or to engraft changes upon the proposed plan and to compel the company to accept the changes. All that we are authorized to do is to approve or to reject the plan proposed by the company. The Legislature has provided a remedy for any stockholder who is dissatisfied with the plan. He may seek an appraisal of his stock and obtain the appraised value thereof upon compliance with the conditions specified in §§ 21 and 38 of the Stock Corporation Law." Obviously this latter remedy is not appropriate to restore or protect the value which the plan has already threatened to destroy.

ments, we all survive various traffic, police, and other regulations, and light and power companies and their holding parents and grandparents are yet operating, in spite of the ministrations of the S. E. C. But the point is that these provisions are announced by the Congress as a part of a general plan of what it considers wise public policy; and we cannot eliminate them, even if we would like to do so. Whatever this court does, indeed whatever may be the end of this present proceeding, the law will remain and the duty of the S. E. C. to hear and decide—if necessary, in a new proceeding and under another section of the statute—will still exist. There are questions here involved too important not to survive a mere ruling of the court's lack of jurisdiction to interfere at a primary stage of the dispute. In fact, one wonders whether defendant is well advised in seeking to shut off an early adjudication of these important issues, in view of what would seem the well-nigh inevitable consequence of rendering its new securities largely unmarketable during the period of uncertainty.[3]

In view, therefore, of the undoubted need of a remedy, I think we should direct our attention to possible ways and means to that end, rather than confine ourselves to discovering objections to the method which the S. E. C. has determined upon. After all, we are agreed upon the need of a temporary stay; the District Court is not very far distant from the offices of the S. E. C. in Philadelphia; and a group of pre-ferred stockholders is already before us as amicus curiae and obviously ready for greater participation if justified in law. I do not think it would be difficult for my brothers—upon finding doubts I do not share as to the procedure actually followed —to find and state a procedure which will accomplish whatever is necessary. And I conceive it a court's duty to do so, particularly in view of the patent admonition of Congress to that effect, in the first section of the Act, where is set forth at length the evils which gave rise to this legislation[4] and the broad public policy intended to be subserved by it. The legislators wisely knew that they could not foresee all the holes which astute counsel might discover in legislation so far-reaching; and so with foresight they stated a broad policy to guide courts in their approach to statutory interpretation. Certainly they could hardly have foreseen a lacuna destructive of the very purposes of specific sections of the Act and resting merely upon the celerity with which a company acts when faced with a call for a hearing before the S. E. C.[5]

Moreover, this very approach was followed in Securities and Exchange Commission v. U. S. Realty & Improvement Co., 310 U.S. 434, 60 S.Ct. 1044, 84 L.Ed. 1293, which reversed this court's conclusion, In re U. S. Realty & Improvement Co., 2 Cir., 108 F.2d 794, that nothing could be done about a more serious gap in the Chandler Act dealing with corporate reorganizations. Now, after the event, we seem inclined to

---

[3] In the light of this situation, resulting from the provisions of the federal statute itself, the memorandum of the New York Curb Exchange as amicus curiae, suggesting, and apparently objecting, that "the stockholders are in effect frozen and this condition will continue so long as the injunction is in effect," seems surprising. The Exchange ought hardly to take sides in a dispute between classes of investors. But in any event, the Exchange would seem to have some obligation to warn traders of the defects attaching to the new stock even if and when it becomes unfrozen.

[4] One of these was the squeezing out of preferred investors. See Sen.Rep. No.621, 74th Cong., 1st Sess., 1935, 26, 58; H.R.Rep. No.1318, 74th Cong., 1st Sess., 1935, 12; S.E.C. Report on Protective and Reorganization Committees, Part VII, 109–187; Dodd, The Relative Rights of Preferred and Common Share-holders in Recapitalization Plans Under the Holding Company Act, 57 Harv. L.Rev. 295; Dodd, Fair and Equitable Recapitalizations, 55 Harv.L.Rev. 780, 796–806, 816; Latty, Fairness—The Focal Point in Preferred Stock Arrearage Elimination, 29 Va.L.Rev. 1, 27–39; Otis & Co. v. S. E. C., 65 S.Ct. 483, supra. pra.

[5] Defendant stresses the need of speedy action under the order of the State Commission and points to the provision in the order that it shall report its acceptance within 30 days after service of the order. But that certainly did not require action the next day and three days before the date of the S. E. C. hearing. Moreover, even if the acceptance required was other than formal, and called for immediate execution of the plan, the Commission, which had been delaying action to secure better results, would obviously have granted more time upon request for cause shown.

discover grounds showing that result pre-destined and easily distinguishable from our present case. Actually, however, the problem of interpretation there was initial-ly much more difficult than the one here. For there, unlike our case, the fundamental jurisdiction of the S. E. C. to act at all was most doubtful, and there appeared to be also positive prohibitions against the S. E. C.'s right even to raise the question. The Chandler Act, in providing for cor-porate reorganizations under Chapter X and for arrangements under Chapter XI, had set forth overlapping and in part con-flicting provisions without any definite sug-gestion for their reconciliation. Accord-ingly the Realty Company sought the pro-tection of Chapter XI (wherein the S. E. C. had no rights or duties of any kind), and nothing in express terms negatived its right so to proceed. This initial question of bankruptcy jurisdiction under the stat-ute was the one which proved most difficult throughout the proceedings; out of a total of twelve judges who heard the case at different stages, six were of the view that the company's right to petition only for an arrangement could not be denied. The eventual denial of that right had to rest, therefore, upon an interpretation of the purposes of the Chandler Act and an ex-position of how these would be frustrated by the contrary holding. As to the S. E. C., its only standing, by the terms of the statute itself, was to report upon a plan in a Chapter X proceeding, under certain con-ditions and with a right of intervention in such a proceeding, but with an express pro-hibition against appeal, § 208, 11 U.S.C.A.

§ 608, which suggested a lack of status be-yond the limited one expressed. The Dis-trict Court, however, had allowed the S. E. C. to intervene to protect the public in-terest involved; and while this part of the court's judgment was reversed by this court, 108 F.2d 794, 797-799, it was ap-proved by the Supreme Court as a discre-tionary ruling under Federal Rules of Civil Procedure 24(b), thus establishing the standing of the S. E. C. to litigate in sup-port of its public responsibilities.[6]

In our present case the jurisdiction of the S. E. C. to act eventually on the issues presented to it for hearing is beyond dis-pute under the statute itself; and its duty to appear as a litigant to enforce its orders —eventually—is likewise clear under § 18 (f), and cf. §§ 11(d)-(f), 25. The real issue, as developed in the opinion herewith, is whether or not this action is premature. (Of course, as a practical matter, action must be taken now to be really effective.) This is demonstrated by the emphasis in the opinion upon an existing jurisdiction of the court as ground for distinguishing cases such as Continental Illinois Nat. Bank & Trust Co. of Chicago v. Chicago, R. I. & P. R. Co., 294 U.S. 648, 55 S.Ct. 595, 79 L.Ed. 1110, Commonwealth of Penn-sylvania v. Williams, 294 U.S. 176, 55 S. Ct. 380, 79 L.Ed. 841, 96 A.L.R. 1166, and Graselli Chemical Co. v. Aetna Explosives Co., 2 Cir., 252 F. 456. But for my part these cases are authority for the S. E. C. here because its jurisdiction, given it by statute, is being exercised to the fullest ex-tent that is presently appropriate. It has taken jurisdiction of the petitions and or-

---

[6] The opinion suggests that recognition of the S. E. C.'s right to intervene un-der F.R.C.P. 24 does not support its right to sue directly. It is believed that nothing in Rule 24 supports such a dis-tinction. True, intervention will not re-quire new grounds of federal jurisdic-tion—an issue which must be faced on an original suit; and injury justifying intervention may more clearly appear when litigation is already under way than where suit is being instituted against *threatened* harm. This is brought out by one of the cases cited in the opinion, Pittsburgh & W. Va. R. v. United States, 281 U.S. 479, 486, 50 S.Ct. 378, 381, 74 L.Ed. 980, as follows: "The mere fact that appellant was permitted to intervene before the Commission does not entitle it to institute an independent suit to set aside the Commission's or-der *in the absence of resulting actu-*

*al or threatened legal injury to it.*" (Italics added.) So the reference in the U. S. Realty case to the 'fact that no personal or pecuniary interest was re-quired for the S. E. C.'s intervention, citing Commonwealth of Pennsylvania v. Williams, 294 U.S. 176, 55 S.Ct. 380, 79 L.Ed. 841, 96 A.L.R. 1166, where the Commonwealth was heard under similar conditions, is support for the general authority of the S. E. C. to act in vin-dication of a public interest, rather than expansion of a procedural rule beyond anything contemplated in its history. See Commercial Cable Staffs' Ass'n v. Lehman, 2 Cir., 107 F.2d 917; 49 Yale L.J. 927, 934; Commentary, Nature of Permissive Intervention under Rule 24b, 3 Fed. Rules Serv. 704; Berger, Inter-vention by Public Agencies in Private Litigation in the Federal Courts, 50 Yale L.J. 65.

dered a hearing with notice, just as it had committed itself to do on its original grant of exemption. And its jurisdiction, thus properly accepted, is now being flouted as directly as was federal power in the cited cases, or in Securities and Exchange Commission v. U. S. Realty & Improvement Co., supra, where, as we have seen, jurisdiction for the S. E. C. was much more difficult to discover, or in In re Debs, 158 U.S. 564, 15 S.Ct. 900, 39 L.Ed. 1092, which was a still broader assertion of federal power and duty.[7] It seems to me that this case is an appropriate vehicle for vindication of an important federal right, brought in the proper federal court within the express language of general federal jurisdiction, 28 U.S.C.A. § 41(1).[8]

But there seems to be a thought that the S. E. C. should first have taken some affirmative action which it could then ask the court to enforce under § 18(f) of the Act. The reasons why the S. E. C. did not itself pass an order of injunction and then ask its enforcement are, as it states, that it wished to proceed with due circumspection and without prejudgment of the case. Further analysis, I believe, will show that it has done all it should properly have done at this stage of the proceedings. It could hardly issue anything like a permanent injunction without due notice and a hearing; this, or its full equivalent, it was proceeding to consider at the appropriate time, and it should be protected against the prejudice

to its proper adjudication of the issues which is offered by the hasty action of the respondent in those proceedings before it. If, on the other hand, it should have issued some formal order of temporary restraint —without full hearing, for which time was lacking—mail service from Philadelphia is only overnight and such order can reach the District Court long before our mandate goes down. But in reality what will that add to the steps already taken by the Commission in first ordering a hearing and later in directing its General Solicitor to institute this action and press it for the safeguarding of the hearing as ordered? I assume we are not prepared to question the authorization of the Solicitor to act in the premises; if we are, the order of authorization will hardly be slow in arriving. All these seem to me only formalities, easily satisfied if not already completed, to justify the position of the S. E. C.; if it can come to the federal courts after a hearing on December 19 to protect its jurisdiction, it should be entitled to come to us before that date to protect a threat against the fairness of its hearing to determine the exercise of that jurisdiction, and the prejudice resulting from a coup d'etat by the corporation most involved.

Finally, if, notwithstanding these years of operation and the numerous court proceedings where it actually has been heard in protection of the public interest, the S. E. C. is found to have not only no duty, but

---

[7] Board of Railroad Commissioners of North Dakota v. Great Northern R. Co., 281 U.S. 412, 50 S.Ct. 391, 74 L.Ed. 936, so far as it goes is also a direct authority. There it was held that intrastate railroad rates established by a state commission would not be set aside because of the pendency of proceedings before the Interstate Commerce Commission at the suit of the carriers. The Court says significantly, 281 U.S. at page 430, 50 S.Ct. at page 396: "It is urged that the restraining power of the Court is needed to prevent irreparable injury. But, in this class of cases, the question whether there is injury, and what the measures shall be to prevent it, is committed for its solution preliminarily to the Interstate Commerce Commission."

[8] As the S. E. C. urges, it seems an overrefinement, suggesting an unnecessary limitation upon the general broad power of federal courts to protect federal jurisdiction as established by Congress, to place jurisdiction here entirely upon the terms of a single specific

statutory enactment and thus circumscribe it by what is there expressed. It seems to me that the S. E. C. should be held entitled to sue here as an officer of the United States enforcing a public right under the laws of the United States. But if it is necessary to look to new grants of power, I suggest that §§ 18 (f) and 25 of the Act do chart the course, and that it is not sufficient to say that they apply only after definite orders of the S. E. C. and for violations thereof. As developed later in the text, it would seem that what the S. E. C. did amounted in substance to a determination that temporary restraint was in order. And rights and duties under the Act were, therefore, definitely threatened, so as to make these statutes applicable if a limited source of jurisdiction is considered thus requisite. Moreover, if there is doubt whether or not the necessary formalities have been completed by the S. E. C., the case should be held, as stated below, until we are sure they have been completed.

264

no right, to act in the present situation, then it seems to me the preferred stockholders who are directly threatened with injury have a clear right to ask the court for relief. I should hold that they had such right under the implications of the Act itself, just as has been held with respect to other acts administered by the S. E. C., Baird v. Franklin, 2 Cir., 141 F.2d 238, 244, 245, certiorari denied 65 S.Ct. 38; Charles Hughes & Co. v. Securities and Exchange Commission, 2 Cir., 139 F.2d 434, 437, 438, certiorari denied 321 U.S. 786, 64 S.Ct. 781; Goldstein v. Groesbeck, 2 Cir., 142 F.2d 422, 427, certiorari denied Groesbeck v. Goldstein, 65 S.Ct. 36; but even if they must show diverse citizenship, as well as a federal right, there are undoubtedly persons who can fulfill all such requirements among the group appearing before us as amicus curiae. At least the case should be held below to give them the opportunity to appear as plaintiffs. Cf. Hackner v. Guaranty Trust Co. of New York, 2 Cir., 117 F.2d 95, 98, certiorari denied 313 U.S. 559, 61 S.Ct. 835, 85 L.Ed. 1520.