In re TRANSAMERICA CORP. et al.

**BOARD OF GOVERNORS OF FEDERAL RESERVE SYSTEM v. TRANS-AMERICA CORP. et al.**

No. 12587.

United States Court of Appeals
Ninth Circuit.
July 10, 1950.

On Application for Stay July 13, 1950.

Writ of Certiorari Denied Nov. 13, 1950.

See 340 U.S. 883, 71 S.Ct. 197.

J. Leonard Townsend, Solicitor, Board of Governors of Federal Reserve System, Washington, D. C. (Gregory O'Keefe, Jr., Washington, D. C., of counsel), for petitioner.

Samuel B. Stewart, Jr., John H. Riordan and Knight; Boland & Riordan, all of San Francisco, Cal., for respondents Transamerica Corporation and Sam H. Husbands.

Theodore J. Roche, Sullivan, Roche, Johnson & Farraher and G. D. Schilling, all of San Francisco, Cal. (Hugo A. Steinmeyer and Robert T. Shinkle, San Francisco, Cal., of counsel), for respondents Bank of America and L. Mario Giannini.

Thurman Arnold, Washington, D. C., for respondents.

Before HEALY, ORR, and POPE, Circuit Judges.

## PER CURIAM.

This is a proceeding seeking to have the respondents Transamerica Corporation and Bank of America, and their respective chief executive officers, Husbands and Giannini, adjudged in both criminal and civil contempt for failure to comply with our temporary restraining order of June 23, 1950, and our injunction order of June 24, 1950, issued in the proceeding described in our opinion dated June 27, 1950, in Board of Governors of the Federal Reserve System v. Transamerica Corporation, 9 Cir., 184 F.2d 311. The facts forming the background of the present proceeding are stated in that opinion.

The order of June 23 restrained Transamerica and Bank of America "from consummating or effectuating any arrangement or undertaking which will result in Bank of America * * * acquiring the assets or banking business of any or all of" the banks named in the order, "until further order of this Court." [1]

On June 27 upon application of the petitioner alleging a violation by the two corporations, and Husbands and Giannini, their Presidents, of these two orders, we issued a rule ordering that the corporations and Husbands and Giannini (hereinafter referred to as respondents) answer the Board's petition and show cause why they should not be adjudged to be in civil and criminal contempt of this court. Bank of America and Giannini filed an answer, as did Transamerica and Husbands. Upon direction of the court, evidence in support of the petition and of the answers was presented by the parties by affidavits.

The showing made by the respondents themselves discloses that Bank of America did, as charged by petitioner, open branches on June 26, 1950, at all the business locations of the several banks described in the injunctive orders, and what we consider to be more significant, Bank of America did so with the assets and the banking businesses previously owned by the individual banks which it acquired at the close of business on Saturday, June 24, 1950.

The affidavits furnished by respondents substantially add to the evidence mentioned in our former opinion, that the arrangement was that the assets and businesses were to be acquired, as they were in fact taken over, precisely at the close of business on June 24. Thus the affidavit of the assistant to the President of Bank of America, who actively handled the arrangements made by the bank, relates a conversation had with the State Superintendent of Banks at which preliminary drafts of documents relating to the proposed acquisition were submitted to him. "During this conference," the affidavit states, "the bank officer informed the chief deputy that June 24, 1950 was programmed as the effective date of the agreements of sale and purchase of the business and assets of both state banks and national banks." Other affidavits produced by respondents disclose that this program for an actual acquisition June 24 was in fact carried out. Thus it was at noon, June 24, that the employees of the individual banks were to become employees of Bank of America. The senior executives of each of the selling banks were informed "that their staffs, intact, would become em-

---

1. The order of June 24, made after hearing, contained like restraints "until after final determination by said board of the aforesaid proceedings."

ployees of Bank of America, effective at noon, June 24, 1950."

In the light of this record, and of the findings made by us in granting the injunction, confirmed as those findings are by the further evidence now before us, it is plain that in the face of this court's order of June 23 the respondents did precisely what they had been enjoined from doing. The consummation, the "takeover," as it is called, occurred when possession of the assets and businesses was taken by Bank of America at the close of business on June 24.

But by their answers and arguments respondents assert that this apparent contempt of the court's order was in truth not such. They contend that the acts we sought to enjoin had been accomplished and completed when our restraining order was served about 4 P.M. on the afternoon of June 23. What we have said both here and in our former opinion sufficiently demonstrates the contrary. The answers allege that possession of these assets and banking businesses had, prior to the issuance of the order of June 23, passed to Bank of America "by virtue of the presence in each of the acquired banking premises from and after June 19, 1950 of a Bank of America assistant branch supervisor and inspector for the purpose of taking over such assets and banking businesses." The affidavits do disclose that such inspectors were at the banks, but they fail to establish that they were there for any other purpose than that of listing the assets on hand and briefing the bank personnel as to procedures and operations to be followed after the take-over occurred. We find no evidence that their presence was for any other purpose, or that it accomplished or was intended to accomplish any change of possession. No assertion of possession through such inspectors was made at the hearing on the motion to vacate the order, and the contention is plainly an afterthought.[2]

But respondents now answer that a fair construction of the restraining order was that it was intended only to prohibit future affirmative action, that it did not require any act theretofore done to be undone, and that after service of the order they did no affirmative act whatever, and hence can not be held in contempt. In support of this plea they have disclosed in great detail the plans made and the procedures adopted to bring about the proposed acquisition of these banks. Negotiations respecting terms of sale were carried on, not between the individual banks and Bank of America, but between Transamerica and Bank of America. Transamerica worked out a program of necessary steps and procedure to be followed, called in officers of the selling banks, told them what would have to be done, and delivered to them forms to be executed and resolutions to be adopted. In each case the required resolution was adopted and Transamerica's consent, as stockholder, was prepared and sent to each bank. Contracts, in the form described in our previous opinion, were prepared and signed. Also in anticipation of the planned acquisitions, the inspectors or auditors of Bank of America, previously mentioned, were sent into the individual banks to make schedules classifying and segregating the assets, and

2. The most detailed account of what the inspectors did was given by the Cashier of one of the banks, who stated in his affidavit:

"Beginning with Monday, June 19, 1950, two inspectors from the Inspection Department of Bank of America, N. T. & S. A. came into the office of the then First National Bank of Fairfield. Schedules classifying and segregating assets were prepared. The bond and security accounts were inspected and classified. Closing entries, accruals, and similar work was done to record on the books of First National Bank of Fairfield the transfer which was to occur. Substantially all of that work was done prior to June 24, 1950, at which latter time the actual writing was put onto the books. Also during that week, the inspector set up files and prepared the necessary papers to transfer certain loans into what Bank of America N. T. & S. A. considers its instalment credit loan, FHA and GI categories."

It will be observed that the appearance of the inspectors was made prior even to the granting by the Comptroller of permits to open the branches.

prepare entries to be put upon the books on June 24.

Letters were mailed to depositors of some of the banks advising them of the contemplated opening of a branch of Bank of America, and that services previously rendered by the selling bank would be furnished at this branch. Advertisements to the same effect were published. Supplies, stationery and forms, printed for use in the contemplated new branch were requisitioned and stored in the banks for use when the branch should open. The staff of employees had been notified, as indicated above, that as of noon June 24 they would be employees and on the payroll of Bank of America.

With all these advance preparations it is quite apparent that so far as these officer respondents are concerned, they were like field generals, who, having made all necessary dispositions of forces, and given all required commands, could simply sit and wait for the arrival of "D Day", knowing that their orders would be executed on time without further command or word from them. But to say that under these circumstances, when the scheduled takeover occurred on June 24, 1950, it was accomplished without any "affirmative act" on the part of the respondent corporations, is to disregard entirely the very nature of all corporate action, which is necessarily vicarious.

■■ A corporate party or the officer of a corporation who acts through agents is not less amenable to an injunction than is a natural person acting individually. When such an individual, prepared and ready to accomplish an act, is ordered not to do that act, as for example, not to take possession of bank assets, he falls into contempt if he proceeds to do so. A corporate defendant is no less amenable though it has previously given complete directions to its agents to take possession. The prohibition runs against the corporation and its agents, or rather against the corporation acting by its agents. And obedience to such an injunction necessarily requires that the prior orders be countermanded— that the agents be instructed not to do that

which they had previously been told to do. Such a countermand, or reversal of instructions, is in no true sense the taking of affirmative action to undo action previously taken. It is no more than an essential step in the process of obedience.

At the close of business on Saturday, June 24, 1950, certain human beings then had actual physical possession of the assets and businesses here in question. The possession was at that moment characterized by two things. At that time the actual book entries evidencing the passing of title and possession were made. At the same moment these persons took on their character as agents of the Bank of America. At that moment Bank of America took title and possession through these agents. That the agents had been previously named and notified is without significance. Obedience to the injunction required that their previous instructions be countermanded.

That this is true with respect to one who is acting through another is self-evident. The duty to countermand directions or arrangements previously made, in order to comply with an injunction not to do something, has been applied even in the case where the act enjoined is being done by an independent contractor acting under prior contract. Walden v. Siebert, 102 Conn. 353, 128 A. 702. It has been extended to the case of one who, enjoined from selling attached property, silently stood by while the levying officer made the sale. Blood v. Martin, 21 Ga. 127. Failure of a principal to stop acts of subordinates, which if done by him, would violate an injunction, is itself a violation on his part. Widener v. Sharp, 109 Neb. 766, 192 N.W. 726.

That respondents were aware of their duty to countermand prior arrangements is apparent from other steps taken by them after service of the order, as they say "out of respect for this court's orders." It appears from their answers and affidavits that upon the service they halted a number of procedures and steps which were it not for such directions would have been completed in regular course. Instructions were given to the Bank of America inspectors

at each of the banking locations and to Bank of America subsidiary real estate corporation, not to accept deeds to banking premises, or if they had already done so, to withhold them from recordation. Action looking towards substitution of trustees on deeds of trust on property securing loans was ordered stopped. Previous instructions to transfer title certificates held by the banks on mortgaged vehicles were cancelled. Previous arrangements to obtain new loss payable endorsements on insurance policies covering security held for loans were countermanded. Previously prepared FHA forms for transfer of insurance in connection with purchase and sale of mutual mortgage insurance loans were ordered held without execution; and the same procedure was adopted with respect to transfer of insurance reserve on FHA loans and veterans' insured loans. Previous arrangements for cancellation of employees' fidelity bonds, workmen's compensation insurance, public liability, fire and other insurance policies, covering the several banks, were halted. The sending of letters of notification to depositaries of securities held by the several banks was ordered withheld. Similarly, transfers of balances carried by the several banks with correspondent banks were not made. Payment of net balances payable to the banks as purchase prices for their assets was stopped. Directions for processing assets acquired from the several banks through Bank of America accounts were countermanded. All prospective meetings for voting liquidation of the banks were called off.

It is noted that all of these countermanding directions relating to incidental details of the take-over involved considerable effort and entailed substantial activity on the part of the respondents. We are unable to understand why respondents, had they been intent on real obedience, found it necessary to take all of these steps and chose at the same time to stop short of giving the one simple countermanding order which both the letter and the spirit of our restraint required, namely, a direction that the take-over, originally planned for the close of business, June 24, 1950, was in consequence of a restraining order of this court, required to be indefinitely postponed. Had respondents, for any reason advantageous to themselves, deemed it desirable to postpone for a week, a month, or indefinitely, the effective date of this transaction, they could by mutual agreement readily have effected that result. They could with equal facility and in the same way have postponed the effective date in compliance with our compulsive order.

By way of justification, or perhaps of mitigation, respondents plead that they were compelled by law or through fear of serious consequences to innocent parties, to proceed as they did when they did. In other words, they plead that it was impossible for them to comply, or impossible to comply except by risking great loss to the depositors of the banks in question.

First it is said the certificates of authorization to open branches issued by the Comptroller of the Currency required them to open the new branches in places of business of the respective banks at the time they did so on June 26. This is not so. They were permissive, not mandatory.

With respect to the state banks, as we pointed out in our earlier opinion, the consent to transfers issued by the Superintendent of Banks did fix an hour for the taking effect of the transfer; but we can not assume that informed of this court's order and presented with a request for the fixing of a later date, the Superintendent would not have amended his approval and his certificates accordingly.

We find no impossibility either in law or in fact arising out of the certificates either of the Comptroller or of the Bank Superintendent.

The affidavits show that on dates ranging from June 12, 1950 through June 22, 1950 Transamerica purchased from the directors of the various banks all of their qualifying shares and paid for the same. The purpose of this purchase appears to have been to obtain for Transamerica a tax advantage through acquisition of a sufficient preponderance of the ownership of stock in these banks to permit consolidated tax returns. We are told that because all of these directors had thus disposed of their qualifying

shares those banks could no longer function. This, it is said, would make it necessary, if Bank of America did not take over these locations when it did, for all these banks to close their doors. Our attention is called to R. S. § 5146, now Title 12, U.S.C.A. § 72, which provides that "Any director who ceases to be the owner of the required number of shares of the stock, or who becomes in any other manner disqualified, shall thereby vacate his place." It is said therefore that the respondents when confronted with our restraining order were required to determine either to go ahead with the proposed take-over so that the new branches might be opened, or to obey our order and force the closing of all these banks on the following Monday morning.

Whatever technical plausibility this argument may have, it is completely unrealistic. For a period of some ten days prior to the restraining order numerous of these banks had been going along conducting business with all their directors in this same situation.

 None of the directors had resigned or quit his post. Nor is it the law that a director ceasing to own the necessary qualifying shares "thereby" automatically vacates his place. Michelsen v. Penney, 2 Cir., 135 F.2d 409. Certainly, the respondent Transamerica in thus taking up these stock certificates from directors had no similar apprehension that the banks could not lawfully continue to do business for the ten days preceding the date of the take-over; and if the banks could lawfully open on Saturday, June 24, they could likewise lawfully open on Monday, June 26. Nor did Transamerica, which planned the liquidation of these national banks, appear to have any concern about its ability to accomplish that liquidation which under § 181 of Title 12 U.S.C.A. must be conducted under the supervision of the board of directors.

We see, in short, nothing in this circumstance of the transfer of qualifying shares which would operate to bring the corporate enterprise or the business of the bank to an end.

Pursuing their contention along this line respondents assert that it would have been impossible to reconstitute a new board of directors for any of the banks which were members of the Federal Reserve System for the reason that Transamerica as a holding company affiliate could not vote its shares in these banks in the election of new directors without obtaining a permit under § 61 of Title 12, U.S.C.A., a process which might well require a long time.

Assuming that a reconstitution of the directorates was necessary, an examination of § 61, supra, discloses that that statute does not contemplate that such a permit must be obtained anew for each election. All that is required is that voting be pursuant to a permit "which permit is in force at the time such shares are voted." The permit is described as one granted by the Board of Governors of the Federal Reserve System "entitling it to vote the stock controlled by it at any or all meetings of shareholders of such bank." Stated conditions of the permit are that the holding company affiliate shall have certain assets "during the life of such permit." Among the agreements exacted of such company as a condition of securing the permit is that it shall "agree that during the period that the permit remains in force" it will not acquire certain securities. The same requirements are extended to state bank members of the System by Title 12, U.S.C.A. § 337.

We are justified in assuming that in the preceding January these bank directors were elected as provided by Title 12, U.S.C. A. § 71. There is no showing before us that the § 61 permit under which Transamerica must have voted its shares in January had expired in June. Nor do we assume that had such a permit expired the petitioner Board would have denied or not promptly granted any permit necessary to reconstitute these boards. We think it absurd to assert that the banks would be unable to function on Monday morning, June 26, with the same boards with which they had been getting along well enough for the preceding ten days.

On behalf of Transamerica and Husbands it is said that they also failed to take any affirmative action in that our order did not require them to reverse any action pre-

viously taken and that therefore in doing nothing they can not have been in contempt.

We think this plea is without substance for the reasons heretofore expressed by us when dealing with a similar plea on behalf of Bank of America. The transfer of assets by the banks was not only carried through by them as tools of Transamerica which arranged all of the terms which it then dictated to the banks but Transamerica as the owner of substantially more than two-thirds of the stock of these banks was obliged to give its consent to the transfer. It was asserted by counsel for Transamerica that once its consent had been executed and filed with the banks it was irrevocable. We perceive no reason why this should be true or why such a consent would not be comparable in respect to revocation to an authorization to an agent. We think that Transamerica can not in these circumstances hide behind its plea of doing nothing but that both the letter and the spirit of the restraining order required Transamerica to use all means within its power including its right to revoke that consent in order to see to it that the enjoined transfer was not consummated or effectuated.

The answers and affidavits filed by respondents pursuant to our rule to show cause contain other matters not relevant to the contempt charge but which relate rather to the question whether the injunction previously issued by us should be permitted to remain in force. Our order denying respondents' motion to dissolve the restraining order and ordering the issuance of an injunction provided in the final paragraph thereof "It is further ordered that respondents may at any time hereafter make further showing, if any they have, why this injunction should not be continued in force." We do not undertake to consider the question of whether a respondent who

has failed to obey the court's order is entitled to take advantage of the privilege extended by the paragraph quoted. Since we are of opinion that we must in this case reach the question of what sanction should here be applied because of a civil contempt, we must of necessity consider whether in view of the additional facts now presented we should by the application of sanctions compel the compliance which respondents have thus far refused.

We have therefore given serious consideration to everything here presented going not merely to the question of contempt, but also to those matters considered by us upon the original hearing of the application for an injunction.

Among the matters thus presented is the affidavit of the Comptroller of the Currency stating in substance that the petitioner Board had knowledge as early as April 14, 1950, that the Comptroller contemplated the issuance at some future date of the certificates authorizing the branches. We are also pressed by argument and brief for reconsideration of the question of our jurisdiction to issue the orders. It is our opinion that nothing contained in the showing now made requires or suggests a withdrawal or a modification of the injunction. Taking as true and uncontradicted the Comptroller's statement, we still think that this matter goes only to a balancing of conveniences and is insufficient to change the result heretofore reached. As for the jurisdictional argument, attention has been drawn to West India Fruit & Steamship Co. v. Seatrain Lines, 2 Cir., 170 F.2d 775, 779. That case affords strong support to the reasoning by which we have arrived at our jurisdictional conclusion.[3]

At the hearing demand was made on the part of various respondents that they be given an opportunity to cross-examine the persons who had executed affidavits which

---

3. Overruling an earlier case the court said: "In any event, the rationale of the Long Island case [S. E. C. v. Long Island Lighting Co., 2 Cir., 148 F.2d 252] lacks pertinence here; for there the majority rested its conclusion on a holding that the S. E. C. unmistakably lacked any possible jurisdiction: on the facts now before

us, we are unable so to hold as to the Commission here." The complaint of the Board of Governors in the Clayton Act proceeding pending before it, a copy of which is a part of the record here, indicates the existence of probable cause for that proceeding and discloses a case within the jurisdiction of the Board.

were offered on behalf of the petitioner. We denied those motions. In reaching the findings and conclusions here indicated we have based our determination as to the facts solely and exclusively upon the answers and affidavits presented by the respondents.

Upon the showing thus made by respondents and for the reasons stated herein we find the respondents Transamerica Corporation, Bank of America N. T. & S. A., Sam Husbands and L. M. Giannini, and each of them, guilty of civil contempt of the court's orders aforesaid. The proceedings relative to criminal contempt are dismissed.

It is directed that an order be entered herein adjudging the said respondents and each of them guilty of civil contempt and that they be required within 30 days of this date to purge themselves thereof by returning and restoring to the said banks the premises, assets and banking businesses referred to herein and in said orders of this court of June 23 and June 24, 1950, and by taking all steps necessary and appropriate to effect such return and restoration.

Compliance with this order shall require that the said Transamerica Corporation and said Sam Husbands shall place the said banks in a position to resume the transaction of business as of the date of the service of the restraining order herein, and that they be freed from any obstacle to their carrying on that business.

Compliance with said order on the part of Bank of America and L. M. Giannini shall require that within said period of thirty days they shall restore said premises, assets and businesses to the said banks.

Said order shall provide that if the respondents shall fail within the time aforesaid to comply with said order the individual respondents shall be imprisoned until compliance is had, and each corporate respondent shall pay a fine of $2,500 per day for each day such failure to comply shall continue.

Counsel for the petitioner Board shall prepare and submit forthwith an appropriate form of order.

On Application for Stay

PER CURIAM.

The application for stay is denied. Had the respondents, after service of our order and injunction, obeyed the same, and then sought a stay pending petition for review, the situation would have been quite different; for then in granting a stay the court would have inherent power to attach such conditions as would assure the preservation of the status quo. See Rule 62 (g) F.R.C.P.

But the respondents did no such thing. They flouted this court's injunctive orders; took action destructive of the conditions which those orders were designed to preserve, and now seek a stay which, instead of preserving that which the orders sought to keep intact, would preserve to respondents the fruits of their contempt. See cases cited, Jones v. Securities and Exchange Commission, 298 U.S. 1, 16, 56 S.Ct. 654, 80 L.Ed. 1015.

A restoration of the status quo ante should be a condition precedent to the granting of any stay.