BRESWICK & CO., and Randolph Phillips, as common stockholders of Alleghany Corporation, Plaintiffs,

v.

UNITED STATES of America, the Interstate Commerce Commission, Alleghany Corporation, the New York Central Railroad Company, Joseph S. Gruss, Charles H. Blatt, Albert B. Cohen, Arthur A. Winner and Alvin J. Delaire, a copartnership, doing business as Gruss & Co., and Samuel A. Mehlman, Edward Gornish and others, Defendants.

United States District Court
S. D. New York.

Nov. 18, 1955.

On Motions for Reargument and New Trial Jan. 27, 1956.

**126**

Rosston, Hort & Brussel, New York City (George Brussel, Jr., and Eugene G. King, New York City, of counsel), for Breswick.

Randolph Phillips, New York City, pro se.

Herbert Brownell, Jr., Atty. Gen. of the United States (Paul W. Williams, U. S. Atty., for the Southern Dist. of New York, New York City, of counsel), for United States.

Leo H. Pou, Washington, D. C., for Interstate Commerce Commission.

White & Case, New York City, and Wheeler & Wheeler, Washington, D. C. (Edward K. Wheeler, Washington, D. C., David Hartfield, Jr., New York City, Robert G. Seaks, Washington, D. C., Andrew O. Miller, Jr., and Morton Moskin, New York City, of counsel), for Alleghany Corp.

Proskauer, Rose, Goetz & Mendelsohn, New York City, for intervening defendants, Joseph S. Gruss and others.

Harold H. McLean, New York City, and Edward K. Wheeler, Washington, D. C., for New York Cent. R. Co.

Samuel A. Mehlman, New York City, pro se.

Edward M. Garlock, New York City, for defendants Baker, Weeks & Co., Oscar Gruss & Son, Irving Neuman as Trustee under a Deed of Trust dated November 6, 1943, and Edward Gornish.

Before FRANK, Circuit Judge, and DIMOCK and WALSH, District Judges.

PER CURIAM.

This is an action to enjoin, or vacate and set aside as void, orders of the Interstate Commerce Commission.

Since the filing of our previous opinion dealing with the preliminary injunction,[1] and of our order granting such an injunction, we have held a hearing on the merits, at which we received evidence, heard extensive arguments, and received

1. The majority opinion is reported at 134 F.Supp. 132.

elaborate briefs, concerning final relief.[1a] As a result, we adhere, for the most part, to what was said in the previous majority opinion.

1. However, we now think the following considerations are pivotal: Defendants' chief contention runs thus: (1) Under the doctrine of United States v. Marshall Transport Co., 322 U.S. 31, 64 S.Ct. 899, 88 L.Ed. 1110, Alleghany was a necessary party to the merger proceedings. (2) The Commission, by its order in those merger proceedings, held it in the public interest that, by the merger, Alleghany should acquire control of the Bridge Company. (3) That order, authorizing Alleghany to acquire that control, made Alleghany, pursuant to Section 5(3), a carrier for purposes of Section 20a, 49 U.S.C.A. §§ 5(3), 20a.

We think item (1) of this argument untenable. For, assuming, arguendo, that, before the merger, Alleghany already controlled New York Central,[2] we think the merger of Bridge Company and Big Four did not involve any further acquisition by Alleghany, a non-carrier. We rest this conclusion on an analysis of 49 U.S.C.A. § 5(2) (a) (i). For convenience, we print, as follows, its provisions in separate sub-paragraphs, assigning each sub-paragraph a Roman number:

"It shall be lawful, with the approval and authorization of the Commission, as provided in subdivision (b)—

"(I) for two or more carriers to consolidate or merge their properties or franchises, or any part thereof, into one corporation for the ownership, management, and operation of the properties theretofore in separate ownership; or

"(II) for any carrier, or two or more carriers, jointly, to purchase, lease, or contract to operate the properties, or any part thereof, of another; or

"(III) for any carrier, or two or more carriers, jointly, to acquire control of another through ownership of its stock or otherwise; or

"(IV) for a person which is not a carrier to acquire control of two or more carriers through ownership of their stock or otherwise; or

"(V) for a person which is not a carrier and which has control of one or more carriers to acquire control of another carrier through ownership of its stock or otherwise; * * * *"[3]

Subparagraphs (I), (II), and (III) deal solely with carriers. Subparagraph (I) deals with a merger, (II) with a purchase, lease or contract to operate, and (III) with a case where a carrier or carriers seek to "acquire control." In contrast, subparagraph (IV) and (V) deal solely with situations which involve "a person which is not a carrier;" as to such a person, those two subparagraphs significantly say nothing whatever about a merger, but relate exclusively to cases in which a non-carrier seeks to "acquire control."

■■ A merger of carriers may involve an acquisition of control by a non-carrier, where, through the merger, the non-carrier acquires control (direct or indirect) of a carrier or carrier property which the non-carrier had previously not controlled; United States v. Marshall Transport Co., 322 U.S. 31, 64 S.Ct. 899, 88 L.Ed. 1110. But where, as in the instant case, the non-carrier (Alleghany) is (according to our assumption, arguendo) already in indirect control of a carrier (Bridge Company), and the merger still leaves the non-carrier in indirect control of such property, no acquisition by the

---

1a. Chief Judge Clark duly designated Judge Frank in place of Judge Hincks who was unable to sit because of illness.

2. As to which, see point II of the Appendix to this opinion.

3. Section 5(2) (a) (ii) reads: " * * * for a carrier by railroad to acquire trackage rights over, or joint ownership in or joint use of, any railroad line or lines owned or operated by any other such carrier, and terminals incidental thereto."

non-carrier results from the merger.[4] This seems to us the plain, clear and obvious interpretation of the statute. Therefore, United States v. Marshall Transport Co., supra, is inapposite. We think the Commission had no power to make any order, in the merger proceedings, which authorized the Alleghany Corporation to "acquire control" of Bridge. Accordingly, so much of the order as purported to do so was a legal nullity.

■ Defendants argue that this interpretation of Section 5(2) (a) (i) is erroneous because the Commission's decisions disclose a contrary well-settled administrative interpretation of that section. We find no such well-settled administrative interpretation. See point I of the Appendix to this opinion, where we discuss the pertinent Commission decisions; it shows that the Commission's interpretations have been not at all consistent and uniform. We assume, arguendo, that, were they clear, uniform and consistent, we would be obliged to abide by them, (a proposition by no means certain when the administrative interpretation is patently irrational).[5] But when administrative interpretations lack consistency and uniformity, the courts give them little or no weight.[6]

■ Alleghany did not seek, nor did the Commission enter, any order approving Alleghany's control of New York Central as in the public interest. Consequently, assuming, arguendo, that Alleghany had acquired control of Central, there is no Commission order, under Section 5(2) which brings Alleghany within the Commission's jurisdiction under Section 5(3).

■ 2. Defendants contend, in the alternative, that Alleghany still has the status of a carrier by virtue of the I. C. C.'s order of June 5, 1945. We rejected that contention in our previous opinion, and see no reason for abandoning that rejection. Alleghany points to 49 U.S.C.A. § 15(2) which provides that "all" orders of the I. C. C. "shall take effect within such reasonable time, not less than thirty days, and shall continue in force until its further order, or for a specified period of time, according as shall be prescribed in the order, unless the same shall be suspended or modified or set aside by the commission * * *". But we think Section 15(2) must be read in connection with Section 15(1) which relates solely to rate orders or the like. A single sentence in the opinion of the Chicago Junction Case, 264 U.S. 258, 270, 44 S. Ct. 317, 68 L.Ed. 667 (per Brandeis, J.) otherwise intimates. But subsequently, in United States v. American Ry. Express Co., 265 U.S. 425, 430, note 3, 44 S.Ct. 560, 562, 68 L.Ed. 1087, the Court (again per Brandeis, J.) said: "Paragraph 2 of section 15 deals only with the time when orders under paragraph 1 take effect."[7]

4. The merger proceedings also involved approval of a lease of Bridge Company's property to New York Central; again, that transaction involved no acquisition of control by Alleghany of property which it had not previously controlled.

5. See the opinion of Judge Learned Hand in Kandelin v. Social Security Board, 2 Cir., 136 F.2d 327, 328, 147 A.L.R. 596.

6. United States v. Missouri Pac. R. Co., 278 U.S. 269, 280, 49 S.Ct. 133, 73 L. Ed. 322; Burnet v. Chicago Portrait Co., 285 U.S. 1, 16, 52 S.Ct. 275, 76 L.Ed. 587; Alexander v. Cosden Pipe Line Co., 290 U.S. 484, 498, 54 S.Ct. 292, 78 L.Ed. 452; Estate of Sanford v. Commissioner, 308 U.S. 39, 49–54, 60 S.Ct. 51, 84 L.Ed. 20; American Surety Co. of New York v. Bethlehem Nat. Bank, 314 U.S. 314, 319, 62 S.Ct. 226, 86 L. Ed. 241; United States v. Healey, 160 U.S. 136, 145, 16 S.Ct. 247, 40 L.Ed. 369; Merritt v. Cameron, 137 U.S. 542, 551–552, 11 S.Ct. 174, 34 L.Ed. 772; Isbrandtsen Co. v. United States, D.C., 96 F.Supp. 883, 891 note 23. See also annotations in 73 L.Ed. 345–349, and 84 L.Ed. 47–50.

7. This subsection of the Act is set forth under the heading: "Determination of Rates, Routes, etc.; routing of traffic; disclosures [of routing], etc."

It was inserted in the Act by amendment of February 28, 1920, after Interstate Commerce Commissioner Clark had so requested on behalf of the Commission, at hearings on H.R. 4378 before

It is noteworthy that Section 16(6) dealing with the suspension or modification of orders of the Commission contains no clause continuing them in effect until such suspension or modification.

Accordingly, when Alleghany divested itself of the control of all carriers, the order of June 5, 1945, became inoperative.[7a] This occurred before the I. C. C. order authorizing Alleghany to issue its new preferred. But, even if we are wrong in this respect, there remains the fact that the I. C. C., in its "status" order, issued by Division Four on March 2, 1955, and affirmed by the full Commission on May 24, 1955, expressly terminated the June 5, 1945 order so that when, on June 22, 1955 the I. C. C. purported to authorize the issuance of the preferred stock, the June 5, 1945 order had already been explicitly nullified.

Consequently, as Alleghany was not within I. C. C. regulation when it proposed to issue its new preferred stock, the issuance of that stock would violate the Investment Company Act for this reason: The S. E. C. order of October 25, 1945, which terminated Alleghany's registration under the Investment Company Act, 15 U.S.C.A. § 80a–1 et seq., ceased to have any effect, at the very latest, on May 24, 1955, and Alleghany was then forthwith within the coverage of the Investment Company Act. Alleghany could not thereafter lawfully issue any new securities because of Section 7 of that Act, 15 U.S.C.A. § 80a–7.

Alleghany contends, however, that the S. E. C. order of October 25, 1945, exempted Alleghany from the Investment Company Act; that, to bring Alleghany within the coverage of the Act required another S. E. C. order; and that no such order has been entered. We cannot agree for this reason: Section 3(c) (9) of that Act, 15 U.S.C.A. § 80a–3(c) (9), exempts from that Act's provisions any company subject to I. C. C. regulation. The S. E. C. order of October 25, 1945 was but a formal recognition of that exemption, which became operative when the I. C. C. made its order of June 5, 1945, since, by that order, Alleghany became subject to I. C. C. regulation. When, however, at the lat-

the House Committee on Interstate and Foreign Commerce, held on July 15, 1919, p. 28. The legislative record makes clear that the I.C.C. sought the amendment because of questions relating to the duration of its rate orders.

Under the heading "Power of Commission to Fix Rates," H.R. No. 456 on the Transportation Act of 1920 states, after a discussion limited solely to rates and routing orders:

"The amendment also provides that orders of the Commission shall continue in force until its further order in lieu of the existing law which provides that they shall continue in force for not exceeding two years. The existing law provides that the Commission may suspend schedules of rates filed with it for 120 days, and for a further period not exceeding six months."

The 1920 Act amended 15(2) as then existing, and changed it to its present form. In explaining the amendment on the floor of Congress, Chairman Esch of the House Interstate and Foreign Commerce Committee stated:

"We also change the existing law which requires rates, fares and charges to remain in existence for a period of two years after the determination of the Commission. We provide no limit, believing that it is wiser, to have no fixed limit. Some of the Shreveport cases were pending for practically two years. It is easy to conceive of a case that might continue for almost two years, and if the present law remained in effect it would mean that the rates established after a long and expensive litigation might become operative for a period much less than the two years." 58 Cong.Rec. 8317 (66 Cong. 2d Session).

Moreover, before 1920, there was no separate subsection 2 in Section 15. A similar provision was imbedded in a paragraph in Section 15 relating solely to rate regulation and the like, and it would have been difficult to argue that such provision applied to I.C.C. orders issued under other sections of the Act. See 34 Stat. 589; 36 Stat. 551.

7a. Alleghany, on January 19, 1954, had divested itself of the control of all but one carrier, the United States Trucking Company, which it controlled through its ownership of the stock of the Pittston Company. On May 21, 1954, it ceased to control even that one carrier.

est on May 24, 1955, the June 5, 1945 I. C. C. order lost its efficacy, thereupon the S. E. C. order of October 25, 1945 became automatically inefficacious, with the result that Alleghany immediately became again subject to the Investment Company Act.[8]

Alleghany cites Securities and Exchange Commission v. Long Island Lighting Co., 2 Cir., 148 F.2d 252, judgment vacated on the ground of mootness, 325 U.S. 833, 65 S.Ct. 1085, 89 L.Ed. 1961, and In re United Corporation, D.C., 128 F.Supp. 725, as authority in support of its contention that the October 25, 1945 order of the S. E. C. continued in effect. The Long Island Lighting Company Case is inapposite.[9] There the S. E. C.

had exercised the discretionary power granted to it under Section 3(a) of the Public Utility Holding Company Act— 15 U.S.C.A. § 79c(a)—to exempt the company from the registration and regulatory provisions of the Public Utility Holding Company Act. Accordingly, before the company could again be subject to the Public Utility Holding Company Act, it was necessary that the S. E. C. take action authorized by 15 U.S.C.A. § 79c(c) to revoke its prior exemption order.[9a] The statute involved in the instant case is materially different from that in Long Island Lighting Company. Here the exemption from the Investment Company Act under Section 3(c) (9) was not at all discretionary with the S. E.

8. The S.E.C. in its opinion accompanying its order of October 25, 1945, 20 S.E.C. 731, said that, if Alleghany in the future ceased to be subject to regulation under the I.C.C. Act, "The order may be revoked, suspended, or modified after appropriate notice and opportunity for hearing."

We think that, since that order was not entered in the exercise of the discretion of the S.E.C., but was entered perforce, this language did not have the effect of excluding Alleghany, when it ceased to be subject to I.C.C. regulation, from the Investment Company Act until a further order of the S.E.C.

In a memo filed on August 1, 1955, by the S.E.C. with Mr. Justice Harlan on a motion to stay enforcement of our preliminary injunction order, the S.E.C. stated:

"It will be noted that Section 3(c) of the Investment Company Act states that 'none of the following persons is an investment company within the meaning of this title,' including under subsection (9) thereof a company which is 'subject to regulation under the Interstate Commerce Act.' Such exclusion from the Act is automatic by statutory definition and is not dependent upon an order of the S.E.C. The S.E.C. order entered in 1945 was made for the purpose of giving formal recognition to that status, since Alleghany had theretofore been registered as an investment company under the statute. Had Alleghany never been registered under the Investment Company Act, a formal order declaring its status would not have been necessary, and its exclusion from the Act

would have been ipso facto applicable solely by virtue of the assumption of regulatory jurisdiction by the I.C.C. The effect of the S.E.C.'s 1945 order served merely to extinguish the prior registration of Alleghany, and as such Alleghany assumed the position of any other company, such as banks, insurance companies, underwriters, and others automatically excluded by the Congress from the definition of an investment company under Section 3(c). So considered, it may be argued that Alleghany should enjoy no greater privilege or right than that accorded to any other company excluded from regulation under the Investment Company Act. Under this approach, if Alleghany lost its status under Section 3(c) (9) it must effect compliance with the Investment Company Act as a condition of doing business, namely, it must register as an investment company and comply with the various provisions of that Act. Absent registration, Section 7 would prohibit Alleghany from engaging virtually in any transaction in interstate commerce, including the proposed offer of exchange."

9. See the comment of the Court of Appeals on that case in West India Fruit & S. S. Co. v. Seatrain Lines, 2 Cir., 170 F.2d 775.

9a. Morris v. Securities and Exchange Commission, 2 Cir., 116 F.2d 896, also cited by Alleghany, involved a discretionary exemption by the S.E.C. under 3 (a) (5) of the Public Utilities Holding Company Act, 15 U.S.C.A. § 79c(a) (5), and is distinguishable on the same grounds as the Long Island Lighting Company case.

C.;[9b] the exemption depended upon the fact that Alleghany, controlling carriers, came within I. C. C. regulation through the I. C. C. order of June 25, 1945. As we said above, when that order lost its effect, the S. E. C. order of October 25, 1945 likewise lost its effect.

In re United Corporation, D.C., 128 F. Supp. 725, dealt with a contention of preferred stockholders that the district court was without jurisdiction to approve the second half of a plan, under Section 11(e) of the Public Utilities Act, providing for the elimination of option warrants held by the preferred stockholders after the completion of the first part of the plan, which required the sale of subsidiaries in order to transform the company from a public utilities holding company into an investment company. Since a single and unified plan was involved, we think the district court correctly rejected the preferred stockholders' contention. However, we do not agree with the district court's statement that it had jurisdiction because the S. E. C. had not yet made an order terminating its jurisdiction.

3. Our previous opinion held that the I. C. C. orders are reviewable and that the plaintiffs have "standing to sue". We adhere to this ruling but modify our discussion to this extent: Defendants rely primarily on New York Central Securities Corp. v. United States, D.C., 54 F.2d 122, affirmed 287 U.S. 12, 53 S.Ct. 45, 77 L.Ed. 138, as authority for their contention that plaintiffs have no such standing. We think that case at most holds that a stockholder cannot, in a suit under the Urgent Deficiencies Act, 28 U.S.C.A. §§ 1253, 2101, 2284, 2324, 2325, assert harm to the corporation;[10] it does not hold that he cannot assert a threatened direct harm to himself as a stockholder. Such a threatened harm exists here, since the right to convert the preferred into common stock may dilute the interest of plaintiffs as common stockholders of Alleghany.[11] The fact that all the common stockholders are threatened with harm does not convert an injury, individual to each common stockholder, into an injury to the corporation which cannot be enforced except derivatively. Nor is it relevant that many of the injured common stockholders have approved Alleghany's action and do not choose to oppose it. Since the plaintiffs are threatened with harm as individuals, it suffices that they owned Alleghany stock when they brought suit.

4. The order granting Alleghany carrier status and approving the issuance of the new preferred stock is reviewable under the test enunciated in Rochester Tel. Corp. v. United States, 307 U.S. 125, 59 S.Ct. 754, 83 L.Ed. 1147. Rochester held that, when an administrative order causes a plaintiff some individual harm, he may seek review of the administrative action in the courts, but that, until the administrative action causes such harm, no review is possible, since the suit would ask "review of interim steps in a proceeding" and would therefore be premature. Although the plaintiffs perhaps suffered no injury from the I. C. C. order granting Alleghany carrier status, they were surely threatened with serious harm by the second order approving the issuance of the new preferred stock. Thus, while the status order, by itself, may not have been reviewable, nevertheless, once the I. C. C. made

9b. Compare 15 U.S.C.A. § 80a–6(c) of the Investment Company Act which gives the S.E.C. discretionary power to exempt a company from the Investment Company Act. This section was not involved in the instant case since the termination of Alleghany's registration was based solely upon 15 U.S.C.A. §§ 80a–3 (c) (9) and 80a–8(f) of the Investment Company Act. See 20 S.E.C. 731.

10. We need not here consider whether a stockholder could do so derivatively.

11. Although the common stockholders could not complain about a dilution of their interest by a lawful issuance of convertible preferred approved by the S.E.C. under the Investment Company Act, they may assert, as a direct injury to themselves, a dilution of their shares by an unlawful issuance of stock pursuant to a void I.C.C. order.

**132**

its order approving the issuance of the new preferred, there arose a right to seek review of the preferred stock order and also of the status order on which the preferred stock order was based.

■ 5. In the majority opinion on the preliminary injunction, it was held that plaintiffs had shown that they were entitled to injunctive relief. The showing necessary to justify a preliminary injunction is probably greater than that necessary for final injunctive relief. See our opinion on the preliminary injunction; see also Restatement of Torts, Section 933, special note at p. 683, as to "inadequacy," and cf. Section 936(2) and Comment d. It follows that the plaintiffs are entitled to final relief.

■ 6. The intervening preferred stockholders urge that we should deny this relief because they have changed their position in reliance upon the orders of the I. C. C.[12] But, as we observed in our previous opinion, any such reliance was upon void orders. The Investment Company Act, and some other statutes relative to the S. E. C., specifically provide that one who, in good faith, relies on the Commission's "rule, regulation or order" shall be protected from liability imposed by the statute even if later a

court holds it invalid.[13] Significantly, the I.C.C. statute contains nothing of the sort.[14]

7. On the basis of the foregoing, the order approving the issuance of Alleghany's preferred stock must be set aside as null and void. There is no occasion to remand to the Commission since, in the merger proceedings, no further evidence or findings could validate that order. Any future effort by Alleghany to obtain a Commission order approving Alleghany's control of Central, as in the public interest, would require entirely new and independent proceedings; no order entered therein could, retroactively, render valid the Commission's order with reference to Alleghany's preferred stock.

8. Should the Supreme Court hold that our interpretation of 49 U.S.C.A. § 5(2) (a) (i) is incorrect, the necessity would arise to consider several matters, many of which were discussed in our previous opinion.[15] For the convenience of the Supreme Court, we have set forth, as point II of the Appendix to this opinion, our findings and conclusions as to those matters, and what would be our alternative disposition of the case.

A judgment will be entered setting aside the Commission's orders with ref-

---

12. These intervening stockholders make much of the fact that they and others like them have invested millions of dollars in the preferred stock, whereas the plaintiffs only own a small amount of common stock. The small amount of stock owned by plaintiffs is irrelevant. See, e.g., Case v. Los Angeles Lumber Products Co., 308 U.S. 106, 115, 60 S. Ct. 1, 84 L.Ed. 110; Subin v. Goldsmith, 2 Cir., 224 F.2d 753 at page 761.

13. The Investment Company Act provides, 15 U.S.C.A. § 80a–37(c): "No provision of this subchapter and sections 72(a), and 107(f) of Title II imposing any liability shall apply to any act done or omitted in good faith in conformity with any rule, regulation, or order of the Commission, notwithstanding that such rule, regulation, or order may, after such act or omission, be amended or rescinded or be determined by judicial or other authority to be invalid for any reason." For similar provisions in other acts, see

15 U.S.C.A. § 80b–11(d) (Investment Advisers Act); 15 U.S.C.A. § 79t(d) (Public Utility Holding Company Act); 15 U.S.C.A. § 77sss(c) (Trust Indenture Act).

14. There is not before us the question whether Alleghany may be liable to preferred stockholders for any loss they may suffer.

15. We grant plaintiffs' motion to amend their complaint to allege that they are suing on behalf of all common stockholders similarly situated. We think the amendment will have no significance, however, unless the alternative basis of decision, set forth in point II of our Appendix, becomes operative. For the amendment will do no more than render the action a spurious class suit and thus allow other common stockholders to join as plaintiffs, if they so desire. See York v. Guaranty Trust Co., 2 Cir., 143 F.2d 503, 518; Dickinson v. Burnham, 2 Cir., 197 F.2d 973, 978.

erence to Alleghany under Section 5(2) (a) (i) and also its order with reference to the Alleghany preferred stock. However, on application of the defendants, we will stay the enforcement of our judgment for 30 days to permit them to seek and perfect an appeal to the Supreme Court. All motions for intervention are hereby granted.

### Appendix I.

Defendants' present contention, that Alleghany was a necessary party to the proceeding before the I. C. C. for approval of the merger of Big Four and the Bridge Company, is claimed to be based on a consistent and uniform administrative interpretation of clause 5 of Section 5(2) (a) and of the holding of United States v. Marshall Transport Co., 1944, 322 U.S. 31, 64 S.Ct. 899, 88 L.Ed. 1110. The asserted uniform administrative construction is that a non-carrier holding company again "acquires control" of already controlled subsidiaries or property whenever there is an internal rearrangement within its system of carrier subsidiaries, and that when such an "acquisition of control" occurs, remote parents as well as immediate parents are necessary parties and are required to join in the application under this section.

Actually, the Commission has not been consistent in holding intra-system rearrangements to be acquisitions of control, even by the immediate parent of the rearranged companies; and it has never found such a rearrangement to be an acquisition of control by a parent other than the immediate parent. Further, it has never required a parent other than the immediate parent to join in the proceeding as a necessary party.

The absence of administrative consistency is most evident in cases involving factual situations similar to the present one, in which the transaction requiring I. C. C. approval was a merger between two subsidiaries of a single parent, or the purchase by one subsidiary of the property and operating rights of another.

In one case the I. C. C. approved the proposed merger without making any finding on the question of acquisition of control or necessity for joinder by the immediate or remote parent of the merged subsidiaries. Scott Bros., Inc.— Merger, 1946, 45 M.C.C. 196.[1]

In another it approved the purchase by one subsidiary of the operating rights and property of another and specifically dismissed their parent's application to "acquire control" as a result of the purchase. Pratt's Express Co.—Purchase— Security Warehouse Company, 1944, 39 M.C.C. 834.

In a third it approved the purchase by one subsidiary of the operating rights of another, found an acquisition of control by the buyer's immediate parent, but made no finding that the immediate parent or the remote parent of the system were necessary parties. United Parcel Service of Portland—Purchase— Wiese, 1941, 37 M.C.C. 473.[2]

In a fourth it approved the purchase by one subsidiary of the operating rights

1. Scott Bros. and Peninsula, a wholly owned subsidiary of Scott, applied to the I.C.C. for approval of the merger of Peninsula into Scott; the I.C.C. approved the merger and authorized the "acquisition of control" of Peninsula by Scott. It failed to find an acquisition of control by Scott's parent, American Co., or by Pennsylvania Railroad, American's parent and the ultimate parent of the system, or to require their presence as necessary parties.

2. United Parcel Service of Portland, a subsidiary of United Parcel of Nevada, which was in turn a subsidiary of Unit-

ed Parcel of Delaware, sought to purchase the operating rights of one Wiese. Previously Wiese had operated under Portland's control by contract; he was an officer of Portland, leased his trucks from it, and his rent and income were so fixed that he had neither profit nor loss. After the proposed sale Wiese would no longer operate his business independently. The I.C.C. found an acquisition of control by Nevada as well as by Portland. It found no acquisition of control, however, by Delaware and did not require the presence of either Nevada or Delaware as necessary parties.

and property of another, but made no specific finding that the parent of the combined subsidiaries (whose presence in the proceeding was required for approval of another transaction), acquired control of the combined subsidiaries as a result of the purchase. Chesapeake & O. Ry. Co. Purchase, 1945, 261 I.C.C. 239.[3]

Finally, in two cases, it found an acquisition of control and a necessity for joinder by the immediate parents of the merged subsidiaries. Pere Marquette Ry. Co. Merger, 1947, 267 I.C.C. 207; [4] Standard Freight Lines, Inc.—Merger, 40 M.C.C. 41.[5]

These decisions reveal nothing more than that the Commission has been inconsistent in determining whether a merger or similar combination between two subsidiaries of a single parent constitutes an acquisition of control by the immediate parent of the combined subsidiaries, and whether the immediate parent is a necessary party to the proceeding in which approval is sought for the combination. They fail altogether to support defendants' contention that a more remote parent "acquires control" or is a necessary party to such a proceeding.[6] In fact, in the only two cases in which the parent of the merging subsidiaries also had a parent, United Parcel, in which the remote parent was a non-carrier, and Scott Bros., in which the remote parent was a carrier, the Commission failed to find an acquisition of control or a necessity for joinder of the parent's parent. In no case has the Commission seen fit to explain or reconcile its conflicting decisions.

The other cases relied on by defendants to support the claimed uniform administrative interpretation of Section 5(2) (a) and the Marshall case involved fact situations which make them inapplicable to the present case.

Thus, where a parent has acquired direct control of a subsidiary by purchase of its stock from an intermediate subsidiary, the Commission has uniformly regarded the purchase as an "acquisition of control". Atchison, T. & S. F. Ry. Co.—Control—Santa Fe Trail Transp., 1938, 15 M.C.C. 469; Warrior & Gulf Nav. Co. Control, 1941, 250 I.C.C. 26; Wheeling and L. E. Ry. Co. Lease, 1949, 271 I.C.C. 713; Kittrell—Control —Dixie Motor Coach Corp., 1941, 37 M. C.C. 91. As vendee, the parent in each of these cases would, of course, be one of the two active participants to the transaction, and a necessary party to the proceeding for approval. Inasmuch as Alleghany has not sought to purchase the stock of any of its subsidiaries, these cases are not applicable.

The Commission has also held where one company, which controls another to a limited extent, acquires an additional or tighter form of control it has "acquired control" within the meaning of Section 5(2) (a). Union Belt Ry. of Oakland Control, 1948, 271 I.C.C. 223.[7]

3. The I.C.C. approved, retroactively, the acquisition of control of Chesapeake & Ohio, Nickel Plate and Pere Marquette by Alleghany under Section 5(2). It also approved a purchase of the property and operating rights by the C. & O. of its subsidiary, Norfolk Terminal. C. & O. already controlled the Norfolk by stock ownership and lease. Alleghany joined in C. & O.'s petition for I.C.C. approval of the purchase of Norfolk Terminal. The I.C.C. made no finding that Alleghany acquired control as a result of Norfolk's purchase by C. & O. Nor does the Commission's opinion suggest that Alleghany would have been a necessary party to that application.

4. Merger of a subsidiary in the third tier of the holding company hierarchy into a subsidiary in the second tier, thus putting the combined subsidiaries under the direct control of the parent.

5. The I.C.C. held that Chaddick, an individual, acquired control and was a necessary party to a proceeding for approval of a merger between two subsidiaries, both already controlled by him through stock ownership.

6. Here Central is the immediate parent of the merging subsidiaries, not Alleghany. Alleghany claims to control Central.

7. Southern Pacific sought I.C.C. approval to acquire control of Union Belt by purchasing its stock, although it already controlled its properties by lease.

Control of Big Four by New York Central, 1922, 72 I.C.C. 96.[8] But these cases are not applicable here, because Alleghany's control of its subsidiaries is not one bit more complete than it was before the merger.

Defendants apparently do not contend that the application for permission for Central to lease the properties of the Bridge Company, which was also submitted to the Commission, constitutes an acquisition of control by Alleghany. In any event, such a claim would be misplaced. Where there is already complete stock control of the components of a system, their over-all control does not depend upon intra-system leases. And the Commission has not expressed any support for such a claim. In Nicholas, Fayette & Greenbrier R. Co. Lease, 1945, 261 I.C.C. 546, it held that parents acquire control as a result of the joint lease of property of a jointly owned subsidiary.[9] This holding, whether defensible or not in cases of subsidiaries held by more than one carrier, as to which a lease could work a shift of power between the two holding companies, has no applicability to the present case which only involves wholly owned subsidiaries of a single holding company. In Industrial Transport, Inc.—Lease, Jenks, 1944, 39 M.C.C. 823, the only case of a lease within such a wholly owned system, the Commission held that a parent who leased his own properties to one of his subsidiaries did not, through the subsidiary, acquire control of what he already owned.

The remaining cases cited by defendants have no apparent relation to the facts of the present case. Control of Central Pacific by Southern Pacific, 1923, 76 I.C.C. 508.[10] Carey & Beveridge—Control—Commercial Carriers, Inc., 1946, 45 M.C.C. 165.[11] Genesee Falls Ry. Co. Control, 1936, 212 I.C.C. 637.[12]

Finally, defendants' contention, that an order under Section 5(3) may be entered by the I.C.C., when it has found an "acquisition of control" as a result of an alteration in the form of control, is unsupported. No court has so held. Neither has the I.C.C., although in two cases the Commission assumed it had such power without attempting to exercise it. In Warrior & Gulf Nav. Co.—Control, supra, it declined to enter such an order as a matter of discretion; and

---

8. New York Central, already owning a majority of the common stock, sought permission under Section 5(2) to acquire preferred stock in the Big Four. Consent of the majority of the preferred was required for certain transactions, and the Commission therefore regarded the acquisition of the preferred stock as an acquisition of control.

9. The I.C.C. held that Alleghany, as the parent of C. & O. was a necessary party to an application by C. & O. and New York Central to lease an extension of the Greenbrier, a carrier which C. & O. and Central already controlled by stock ownership.

10. The I.C.C. granted Southern Pacific authorization to acquire control by lease and stock ownership of Central Pacific, even though it already had such control. The Supreme Court, however, had just found its control in violation of the anti-trust laws, and ordered divestiture. Southern Pacific therefore sought to acquire lawful control by I.C.C. approval which would exempt it from the provisions of the anti-trust laws.

11. Previously, Carey, Beveridge and one Travers had owned two carriers. Carey and Beveridge acquired Travers' interests in both. In effect the Commission held there was an acquisition of control by Carey and Beveridge which had not previously existed and which required I.C.C. approval under Section 5(2).

12. New York Central applied for I.C.C. authorization to acquire 100% of the stock of Genesee Falls Ry. and to merge that corporation into Central. Central already owned "about half" of Genesee's stock. The balance, which was substantially valueless, was owned by several of its customers. The I.C.C. approved the merger and authorized the acquisition of control of Genesee by Central by acquisition of all its capital stock. There was no finding that Central's ownership of stock before the proposed transaction had enabled it to control Genesee.

in Nicholas, Fayette & Greenbrier R. Co. Lease, supra, it declined because Alleghany was already considered a carrier under an order entered in a prior case. In Chesapeake & O. Ry. Co. Purchase, supra, also relied on by defendants, the I.C.C. did not appear to base its application of Section 5(3) to Alleghany on the latter's application for approval of the purchase of the property of Norfolk Terminal, its already held subsidiary. Rather, the applicability of Section 5(3) was based upon retroactive approval of Alleghany's acquisition of control of the C. & O., Nickel Plate and Pere Marquette.

### Appendix II.

The opinion on the application for a preliminary injunction departed too far from reality in taking the position that the application of the I.C.C. implied a request that it pass on the propriety of Alleghany's control of the Central. We believe that the I.C.C. had no appropriate application before it for a determination of the question of control. The case cannot, therefore, be remanded for such a determination.

If we are wrong, however, in this holding that the I.C.C. is without jurisdiction, the case should be remanded for the determination of (1) whether Alleghany does control Central and (2) whether such control is in the public interest.

The I.C.C.'s orders purported to determine the question of control of Central but that determination cannot stand (a) because the findings as to Alleghany's control of Central are insufficient, (b) because the evidence does not support those findings, and (c) because plaintiffs were deprived of an evidentiary hearing on that issue of control. We have little to add to the treatment of those questions in the opinion on the motion for a preliminary injunction.

■ 1. In additional support of our determination that the opinions of the I.C.C. are defective, in that ultimate facts to support their conclusions are not found therein, we cite, Baltimore &

O. R. Co. v. United States, D.C.N.Y., 22 F.Supp. 533, 537 and M. & M. Transp. Co. v. United States, D.C.Mass., 128 F. Supp. 296, 298–299.

■ 2. To our discussion of the failure to give an evidentiary hearing we add the following:

The I.C.C. Rules of Practice (see 49 U.S.C.A.Appendix) contemplate an evidentiary hearing on oral argument, or by deposition, except in a "shortened" or "modified" proceeding. See Rules 5(j) and (k), 44, 44(b), 45(b), 50 and 74. Nothing in the record shows that here the proceeding was "shortened" or "modified" in the manner provided in Rules 44 and 45(b).

Rule 19 provides that "facts in a pleading filed prior to oral hearing" should constitute evidence "unless specifically denied in a counterpleading". If the intervenors "specifically denied" facts alleged in Alleghany's application, they were entitled to a hearing on oral evidence or depositions as to such denied facts. As an example of such a specific denial we note plaintiff Breswick's statement in its amended petition of February 18, 1955, that "Alleghany Corporation is not in control of * * * the New York Central". This specifically denies the statement in Alleghany's application that it "recently * * * acquired control of the Central".

Section 5(2) (b) provides that the Commission "shall afford reasonable opportunity for interested parties to be heard." Section 17(3) provides that all hearings "shall be public upon the request of any party interested." Section 5(2) (b) provides that "if the Commission shall consider it necessary * * *, it shall set [aside] said application for public hearing; and a public hearing shall be held in all cases where carriers by railroad are involved unless the Commission determines that a public hearing is not necessary in the public interest." As Alleghany admits (in printed brief) Sec. 17(3) indicates that there may be hearings that are not "public". But Alleghany argues that Sec. 5(2) (b) is an

exception to Sec. 17(3), because the former gives the Commission discretion. However, assuming, arguendo, that Sec. 17(3) does not deprive the Commission of discretion under Sec. 5(2) (b)—i. e., discretion not to hold a public hearing even if one is requested by interested parties—it still seems true that there can be a non-public hearing under Sec. 5(2) (b) at which "interested parties" must have a "reasonable opportunity to be heard."

Federal Communications Comm. v. W. J. R. The Goodwill Station, 337 U.S. 265, 69 S.Ct. 1097, 93 L.Ed. 1353, related, not to the presentation of evidence, but solely to the oral argument of legal questions. Moreover, the F.C.C. statute, 47 U.S.C.A. § 312(b), did not provide for an "opportunity to be heard," but only for "reasonable opportunity to show cause." In addition, even as to oral argument, the Supreme Court, 337 U.S. at pages 275–276, 69 S.Ct. at page 1103, noted that, "in some situations," such an oral argument is essential to a fair hearing. A "situation" which involves the very jurisdiction of the Commission would seem to be such a situation.

■■■ It is true that plaintiffs were not entitled to an evidentiary hearing if they did not own Alleghany stock when they sought to intervene. However, Breswick & Co. alleged such ownership in their petition for intervention and this was not denied by Alleghany in its answer. We feel that we ought not to go behind the I.C.C. record.

■■■ 3. The I.C.C. opinions were further defective in their failure to find that the acquisition by Alleghany of control of the Central was consistent with the public interest. It is provided, 49 U.S.C.A. § 5(2) (b), that the I.C.C.'s approval shall be given if it finds that "the proposed transaction * * * will be consistent with the public interest."

■■■ The fact that the statute contemplates consideration of a "proposed" transaction does not mean that a consummated, though unauthorized, trans-

action must be accepted as legitimate. The I.C.C., when asked to approve a past acquisition made without I.C.C. approval, will deny the retroactive approval except perhaps where the "illegal" past acquisition was made in good faith. See Bingler case, 7 Fed.Carriers Cases, No. 31869, p. 605 at 606.

The finding of public interest is of very real importance. It has been held to include the following factors: Adequacy of transportation, economy and efficiency effected by the change, necessity and appropriateness of the change in serving the public need, maintenance of desirable competition, avoidance of hampering restraints. Schwabacher v. United States, 334 U.S. 182, 193–194, 68 S.Ct. 958, 92 L.Ed. 1305; New York Central Securities v. United States, 287 U.S. 12, 24–26, 53 S.Ct. 45, 77 L.Ed. 138; United States v. Lowden, 308 U.S. 225, 230, 60 S.Ct. 248, 84 L.Ed. 208; Standard Oil Co. of Cal. and Standard Stations v. United States, 337 U.S. 293, 311, 69 S.Ct. 1051, 93 L.Ed. 1371.

In Weinstein-Control-Capital Transit & Montgomery Bus Lines, 56 M.C.C. 127, 134, Division 4, (Mahaffie, Rogers and Patterson) held that the fitness of the person acquiring control, financially and otherwise, was a proper factor for consideration.

Prior violations of the Act were considered in § 5(2) applications in Marcell-Purchase-Flemings, 39 M.C.C. 5. (This factor has also been taken into account in connection with merger applications.) Zeffrin Truck Lines, Inc.-Merger, 37 M. C.C. 33; Hankenson-Control-Mutual Trucking, 37 M.C.C. 617.

Public interest would undoubtedly include other factors if the circumstances required. For example the I.C.C. might well conclude that a proposed acquisition by a foreign government was not in the public interest.

We consider sound the authorities cited by Division 4, and in the opinion on the preliminary injunction in support of the holding that such a finding must be made. Alleghany's attempted distinc-

tion does not stand up. The two cases on which it relies are Weinstein-Control-Capital Transit & Montgomery Bus Lines, supra, and Seaboard Airline Ry. Co. Receivership, 261 I.C.C. 689. It is said that the former relates to a motor carrier and motor carriers in order to obtain a certificate of public convenience and necessity under §§ 306–307 must be found "fit, willing and able properly to perform the service proposed" whereas there is no such requirement in the case of rail carriers. This observation is true but irrelevant. The holding in the Weinstein case was in no sense based upon §§ 306 and 307. The only section under discussion was the same one before us now, § 5(2). Similarly, an attempt is made to distinguish the Seaboard case because one of its subsidiaries was a water carrier. This fact may be true, but again that was in no way the basis for the I.C.C. determination and it is not commented on in connection with the holding that acquisition of control of a previously combined system required I.C.C. approval under § 5(2).

An additional case supporting the need for this finding is Arkansas & L. M. Ry. Co. Control, 282 I.C.C. 254, Division 4, (Mahaffie, Rogers and Mitchell). In that case a corporation acquired four small rail carriers previously owned directly or indirectly by the selling corporation. Its acquisition was held to require I.C.C. approval. (p. 260). Further the individuals who, by a voting trust, controlled the acquiring corporation were also held to be in indirect control of the four carriers and therefore approval of their acquisition was necessary. (p. 263).

On Motion for Reargument.

Defendants Baker Weeks & Co. et al. have moved for reargument of this case.

Only one of the points raised in the elaborate brief submitted in support of the motion requires comment. The earnestness with which defendants' position is advanced leads us to take note of it. It is said that New York Central Securities Corp. v. United States, D.C.S.D.N.Y., 54 F.2d 122, affirmed 287 U.S. 12, 53 S.Ct. 45, 77 L.Ed. 138, stands for the proposition that, where a parent corporation which has theretofore controlled a subsidiary by virtue of stock ownership modifies that form of control by entering into a lease of the properties of the subsidiary, the transaction constitutes an acquisition of control within the terms of Interstate Commerce Act, § 5(3), 49 U.S.C.A. § 5(3). Suffice it to say that in the New York Central Securities case the court dealt with section 5(2) of the Transportation Act of 1920, 49 U.S.C.A. § 5(2), which did not distinguish between transactions which did and did not constitute acquisitions of control.

The statute here involved, Interstate Commerce Act, § 5(2), 49 U.S.C.A. § 5(2), draws just that distinction and classifies transactions between those which are mere mergers, leases, etc. and those which involve the acquisition of control. It is only those transactions which involve the acquisition of control which may form the basis for an order under section 5(3) that a person not a carrier shall be considered as a carrier.

The motion for reargument is denied.

On Motion for New Trial.

This is a motion by defendant Alleghany Corporation to set aside a judgment and for a new trial upon the strength of evidence newly presented to the court.

The assailed judgment, among other things, set aside (a) orders of the Interstate Commerce Commission insofar as they determined that Alleghany Corporation was in control of the New York Central Railroad and insofar as they determined that Alleghany Corporation should be considered as a carrier subject to the provisions of section 20(1) to (10), inclusive, and section 20a(2) to (11), inclusive, of the Interstate Commerce Act, 49 U.S.C.A. §§ 20(1–10), 20a(2–11), and (b) orders of the I.C.C. authorizing issuance of 6% convertible preferred stock. As a ground for our

conclusion of the invalidity of the determination that Alleghany Corporation should be considered as a carrier, we pointed out that the action of the I.C.C. relied upon as having that effect was the approval of a merger of the Louisville & Jeffersonville Bridge & Railroad Co. into the Cleveland, Cincinnati, Chicago and St. Louis Railway Company, known as "the Big Four". These two carriers were already controlled by the New York Central. In turn Alleghany claimed that it controlled the New York Central. Alleghany was not actually a carrier but sought status as a carrier by virtue of Interstate Commerce Act, § 5(3), 49 U.S.C.A. § 5(3), which provides that, whenever a person which is not a carrier is authorized, by an order entered under paragraph (2) of the same section to acquire control of a carrier or carriers, "such person thereafter shall, to the extent provided by the Commission in such order, be considered as a carrier * * *." We held that, since the I.C.C. approved only a merger of carriers already controlled by a single parent, no acquisition of control was involved and the I.C.C. had no jurisdiction, by virtue of its approval of the merger, to provide that Alleghany should be considered as a carrier.

Since the I.C.C.'s power to authorize the issuance of the preferred stock depended upon the existence of a valid order authorizing Alleghany to acquire control of a carrier or carriers and providing that it be considered as a carrier, we set aside the orders authorizing the issuance of the preferred stock.

The matter which Alleghany now, for the first time, presents to us as a basis for setting aside our judgment is an order of the I.C.C. in Boston and Albany Railroad Company et al., Control, Finance Docket 18789, decided March 22, 1955. That proceeding, it is said, involved new acquisition of subsidiaries of the New York Central, rather than mere merger, so that an order authorizing that acquisition might validly have provided that Alleghany should be considered as a carrier. The order actually entered contained no such provision. It was, however, entered prior to the orders authorizing the issuance of the preferred stock so that, as far as chronology is concerned, it might have lent support to the I.C.C.'s power to make those orders of approval.

While the cause of the omission from the Boston and Albany order of a provision that Alleghany should be considered as a carrier may perhaps have been the belief of the I.C.C. that there was a valid outstanding order to that effect in the proceeding here under review, that does not alter the fact that the Boston and Albany order contained no such provision. Without a direction that the non-carrier shall be considered as a carrier the authorization of the acquisition of a carrier does not create that status. Section 5(3) merely provides that the authorization shall create that status "to the extent provided by the Commission in such order". The plain meaning of the statute that, no matter how eligible may be the controlling corporation, status as a carrier shall be conditioned on a provision to that effect in the order, has been recognized by the I.C.C. In Warrior & Gulf Nav. Co. Control, 250 I.C.C. 26, the I.C.C. says in so many words, p. 28, that the United States Steel Corporation, by the transaction authorized, "unquestionably will acquire control of the company"; it nevertheless concludes, p. 32, that it will not include any provision that the steel corporation shall be considered as a carrier since it perceives no reason for its regulation under the Interstate Commerce Act.

Thus the Boston and Albany order gave no validity to any of the orders set aside by our judgment. If the judgment was correct in the light of the information before us when it was rendered, it is still correct. The existence of the Boston and Albany order in its present form does not change the legal situation.

We presume that what we are really asked to do is to vacate our judgment and hold proceedings in abeyance while Alleghany applies to the I.C.C. for an amendment of the Boston and Albany

order so as to contain a direction that Alleghany shall be considered as a carrier. Even if such an amendment should be obtained, nothing would be settled since, for example, difficult questions would arise as to the effect of such an amendment on proceedings taken before its accomplishment.

We are advised that a prompt appeal to the Supreme Court is contemplated and our view is that the ends of justice will be better served by an immediate and authoritative determination of the questions raised in the existing record than by a delayed and doubtful nunc pro tunc repair job.

There remains the possibility that Alleghany may wish to take, concurrently with the appeal, proceedings in the Boston and Albany case before the I.C.C. in order to obtain determinations there that Alleghany is in control of New York Central and that that control is in the public interest.

We express no view as to the propriety of such a course. It may be that the Boston and Albany case does not really involve an acquisition of control or that there are other reasons which render the course improper or impracticable. We do emphasize, however, that if authorization of Alleghany's control of Central is to be considered in connection with the Boston and Albany case that proceeding must be so conducted that this issue is not subordinated. This means that applications to intervene, pleadings, testimony, and findings with respect to this issue must receive the same full consideration which would be given if it were the sole application before the Commission.

Alleghany moves in the alternative that the judgment be amended so as to lift the prohibition therein contained against the carrying out of the offer to exchange the new preferred stock. We see no reason for modifying the decision which we reached after careful consideration of all of the arguments now advanced.

Both motions are denied.